**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**Waite, Schneider, Bayless &**
**Chesley Co., L.P.A.,**

   **Plaintiff**        **Case No. 1:11CV00851**

 **v.**

**Allen L. Davis,**

   **Defendant**       **ORDER**

  Pending are objections by plaintiff and counterclaim-defendant Waite, Schneider, Bayless

& Chesley Co., L.P.A.'s (Waite firm) to a Magistrate Judge's decision (Doc. 55) denying plaintiff's

motion to compel discovery (Doc. 46)

  Jurisdiction is proper under 28 U.S.C. § 1332.

  For the reasons that follow, I reverse the Magistrate Judge's order and, in accordance with

this order, grant the motion to compel.

**Procedural Background**

  This is a discovery dispute arising out of what began as a fee collection case. The Waite firm

sued defendant, counter-plaintiff, Allen Davis to recover fees. The fees were for services which the

Waite firm provided while representing Davis in a shareholder squeeze out dispute with CNG

corporation.[1]

---

[1] CNG is an subchapter S corporation in which Davis and his two sons own the majority
of outstanding shares.

1

The Waite firm also represented Davis in global settlement and arbitration proceedings;[2] and finding a buyer for his CNG shares.[3]

Davis has filed a counterclaim asserting breach of contract, breach of fiduciary duty, and malpractice.

Davis asserts that the Waite firm had a duty to represent him in three additional disputes between him and CNG.[4][5] The gravamen of Davis's countersuit is that the plaintiff firm breached their agreement when it failed to represent him in the additional disputes.

Davis also claims the Waite firm negligently represented him because the firm did not assert legal and equitable claims in his squeeze out action.[6]

Davis seeks: 1) damages equal to the attorney's fees he paid to have other law firms represent him in the three additional suits, and 2) a declaration that the Waite firm is not entitled to any fees.

_____

[2] The Waite firm worked with two other firms attempting to resolve four disputes between Davis and his sons. The suits were pending simultaneously in different venues.

[3] Davis disputes that he hired the Waite firm for this purpose. However, the emails already produced during discovery show Davis discussing buyers with the Waite firm. Nonetheless, I do not decide this contested factual issue.

[4] According to Davis, the Waite firm was required to represent him in his tax dispute with the I.R.S.
Davis also asserts the Waite firm was obligated to defend him when CNG sued him for: 1) misusing company funds/altering a property purchase agreement; and 2) breaching various provisions of a company memorandum of understanding.

[5] I will refer to the cases underlying the breach of contract claim as the: 1) tax case; 2) real property case; and 3) close corporation agreement case.

[6] According to Davis, the Waite firm should have asserted legal claims for breach of CNG's shareholder agreement and the associated memorandum of understanding and requested money damages.

To prepare its fee case and, more importantly and pertinently, its defense to the countersuit, the Waite firm seeks to discover: 1) the testimony of the lawyers who represented Davis in his tax, property, and close corporation agreement cases; and 2) all documents related to those actions, including the settlement agreement, court filings, depositions, and communications between Davis and his other attorneys.

In response to the law firm's discovery demand, Davis has invoked the attorney client privilege and work product doctrine. He has produced a 215-page privilege log and refused to provide testimony of his lawyers and a substantial number of documents.[7]

Relying on the Ohio Supreme Court's opinion in *Squire, Sanders & Dempsey, LLP v. Givaudan Flavors Corp.,* 127 Ohio St. 3d 161 (2010), the Magistrate Judge denied the Waite firm's motion to compel the withheld discovery. (Doc. 55).

After a telephone conference with the parties, I requested Davis produce the documents listed in the 215-page privilege log for *in camera* review. On the basis of a review of all submitted documents I reject Davis's claims of attorney-client privilege and work product.

## Factual Background

### 1. CNG and the Original Squeeze Out Action

Davis has three children, Jared, David, and Laura.

Jared, with Davis's financial assistance, started CNG in 1994. Primarily a payday loan enterprise with some real estate holdings, the company was immediately successful.

---

[7] Davis has produced some time records. He has also produced some emails between the firms and Davis and emails among the firms that included the Waite firm as a recipient or cc'd the Waite firm.

Around 1995, Davis's children granted him an option to purchase shares constituting 11.5% of CNG. They did so, according to Davis, because he had previously provided millions of dollars in unsecured financing to the company while also guaranteeing its bank loans.

In 1997, the family members entered into a stock transfer restriction agreement granting one another first rights of refusal.

In 2000, Davis exercised his option. He also became president and CEO of the company. By this time, CNG operated in over two dozen states and had nearly 2000 employees.

Davis resigned as president and CEO approximately seven months later. However, he continued to be a shareholder and creditor.[8]

Shortly after Davis's resignation, his wife filed for divorce.

At the end of 2001, to assist with division of Davis's assets incident to the divorce, CNG repurchased shares Davis's wife had acquired during the divorce. CNG purchased the shares subject to an option agreement giving Davis the option to buy back the shares at a future date.

In December, 2002, CNG's attorneys prepared a shareholder agreement. The shareholders agreement covers, *inter alia*: 1) compensation; 2) payment of dividends; 3) voting deadlocks; 4) buy/sell restrictions; 5) voting rights; and 6) the obligation of Davis, Jared, and David to guarantee CNG loans.

Also in December, 2002, Davis, Jared, and David entered into a memorandum of understanding. Under the terms of that agreement, Davis, Jared and David agreed to make yearly adjustments to equalize the benefits each received. The memorandum of understanding states, *inter*

---

[8] According to Davis, as of 2002, CNG owed him $10,124,700, and his notes were subordinate to CNG's other debt.

4

*alia*, that "all benefits of any kind provided to [Davis, Jared, or David] by the Company shall be equal."

In 2004, Davis attempted to exercise his rights under the option agreement to repurchase the shares he had transferred to his ex-wife. Davis and his sons thereupon disputed the: 1) tax treatment of the shares; 2) number of shares to which Davis was entitled; and 3) value of the shares. The minority shareholder squeeze out litigation ensued.

Davis engaged the Waite firm around February, 2005, to represent him in the squeeze out litigation with CNG.

That month the Waite firm filed a complaint on behalf of Davis.[9]

On February 21, 2005, before the Waite firm filed suit, it executed an engagement agreement with Davis. Under the terms of the engagement agreement, the Waite firm agreed to represent Davis on "claims related to [Davis's] CNG investments."

The agreement states, *inter alia*: 1) the Waite firm is entitled to a contingent fee of either 25 or 33% depending on the date of recovery by way of "suit, compromise, settlement, judgment, or otherwise;" 2) Davis is to compensate the Waite firm for the "fair value" of any injunctive relief

---

[9] According to Davis's complaint CNG had: 1) mischaracterized the transfer of the shares as compensation for services, and 2) given him too few shares under the option agreement. Davis argued that by providing him with too few shares, CNG had reduced his control over company operations and his right to dividends. Davis asked that the court declare the: 1) proper number and value of shares to which he was entitled; and 2) tax status of the shares. Davis further requested the court to: 1) enjoin CNG temporarily from holding meetings, issuing stock, or making other payments, and 2) make a declaration of the individuals who were currently shareholders in CNG.

obtained;[10] 3) in the event of a rightful termination the Waite firm is entitled to the "reasonable value" of its services on the "successful resolution of the matter or completion of any litigation."[11]

For approximately six years the Waite firm successfully represented Davis in federal and state court litigation, including arbitration and settlement proceedings, related to the squeeze out dispute. According to the Waite firm, it devoted nearly 10,000 hours to representing Davis.

During this period the Waite firm represented Davis in: 1) twenty-five depositions; 2) seventy court hearings in Hamilton County, Ohio; 3) three ancillary proceedings in the United States District Court for the Southern District of Ohio; and 4) seven arguments in various appellate courts. In addition, the firm filed motions to remove to federal court, compel inspection of company documents, and compel compliance with an inspection order and for a temporary restraining order and a preliminary injunction.

### 2. Other Lawsuits between Davis and CNG

During the course of the Waite firm's representation of Davis, Davis's sons/CNG started two additional suits against him. In addition, the IRS served Davis and his sons with notices of deficiency for failing to pay tax on Davis's option.

First, on December 22, 2005, CNG sued Davis in the real property case in the Circuit Court of Sarasota County, Florida. Livingston, Patterson, Strickland & Siegel (Livingston firm) and Shumaker, Loop, & Kendrick (Shumaker firm) represented Davis in the real property case.

---

[10] The agreement also states that if the parties fail to agree on the "fair value" of any injunctive relief obtained, then they "agree to have the value established by a neutral third party that [they] will jointly select."

[11] On August 27, 2005, the Waite firm and Davis executed a supplemental fee document providing for the possibility that Davis might recover money in installments rather than as a lump sum.

CNG claimed Davis had used company funds to make a down payment on a condominium unit. According to the shareholders, Davis intended to keep the unit for himself rather than purchasing it as an investment for CNG. According to CNG, Davis should have used his own funds for the down payment.

Next, the IRS issued its deficiency notices on October 11, 2006, against both Davis and his sons. The IRS challenged the failure to pay tax when Davis exercised his option in 2004.[12]

On November 27, 2006, Davis began the tax case against the IRS in Tax Court. That court consolidated Davis's case with those of the other shareholders on April 27, 2007. Baker & Hostetler (Baker firm) represented Davis in the tax case.

Finally, on April 1, 2010, the CNG and its shareholders (Davis's sons)  began the close corporation agreement case against Davis in Sarasota County. The plaintiffs asserted Davis breached their memorandum of understanding. Specifically, Davis's sons alleged that they were entitled to compensation equal to the value of the shares Davis received when he exercised his option. The Shumaker firm also represented Davis in that dispute.

In addition to these specific representations, the Shumaker and Baker firms assisted the Waite firm with the global settlement negotiations and arbitration proceedings. The Baker firm also assisted Davis in finding a buyer and completing the sale of his shares.

**Standard of Review**

Legal conclusions of the Magistrate Judge are reviewed *de novo. Gandee v. Glaser,* 785 F. Supp. 684, 685 (S.D. Ohio 1992). Whether the attorney-client privilege applies is a mixed question

---

[12] Referred to in the tax law world as a "whipsaw" proceeding, the IRS took inconsistent positions to determine the party responsible for paying tax.

of law and fact. *Ross v. City of Memphis,* 423 F.3d 596, 600 (6th Cir. 2005). Thus, I review the

decision of the Magistrate Judge *de novo. Id.*

## Discussion

### 1. The Attorney-Client Privilege in Ohio[13]

The attorney client privilege "bestows upon a client the privilege to refuse to disclose, and

to prevent others from disclosing, confidential communications made between the attorney and

client in the course of seeking or rendering legal advice." *H&D Steel Serv. v. West, Hurd, Fallon,*

*Paisely & Howley,* 1998 WL 413772, *2 (quoting *Frank W. Schaefer, Inc. v. C. Garfield Mitchell*

*Agency, Inc.,* 82 Ohio App. 3d 322, 329 (1992)). The purpose of the attorney-client privilege "is to

encourage full and frank communication between attorneys and their clients and thereby promote

. . . the observance of law and administration of justice." *Id.*

Ohio has long recognized the attorney-client privilege is not absolute. Both O.R.C. §

2317.02(A), which codifies the privilege, and Ohio's common law limit the privilege. *Squire*

*Sanders, supra,* 127 Ohio St. 3d at 165.

Section 2317.02 (A) of the Ohio Revised Code permits a lawyer to disclose attorney-client

communications if their client either consents or expressly waives the privilege.

Under Ohio common law, lawyers can also disclose communications if a common law

exception to the privilege applies. *See Squire Sanders, supra,* 127 Ohio St. 3d at 166.

---

[13] Ohio privilege law controls. Fed. R. Evid. 501.

Prior to the Ohio Supreme Court's decision in *Jackson v. Greger,* 110 Ohio St. 3d 488, 491 (2006), several Ohio appellate courts had also recognized the common law doctrine of implied waiver.[14]

In *Jackson*, the Ohio Supreme Court held that the waiver provision in O.R.C. § 2317.02 (A) encompasses only express waiver. *Id*. at 490 (stating that in enacting O.R.C. § 2317.02 (A) the general assembly intended to "limit the means by which a client's conduct may effect waiver of the attorney-client privilege" to instances involving express waiver.).

Ohio thus no longer recognizes the common law doctrine of implied waiver.

Davis, noting the Waite firm's citation of implied waiver cases, contends that doctrine does not support compelling production in this case because: 1) the communications the Waite firm seeks are not at issue; and 2) denying the Waite firm access to the communications will not prejudice its ability fairly to defend itself against Davis's counter-claim.

---

[14] Under the doctrine of implied waiver, a client impliedly waived the attorney-client privilege if the client had placed attorney-client communications at issue, usually by refusing to pay fees or bringing an action for malpractice or other wrongdoing.  *Jackson, supra,* 110 Ohio St. 3d at 491 (2006).

To determine whether a client had put attorney-client communications at issue, Ohio appellate courts applied the implied waiver test from *Hearn v. Rhay,* 68 F.R.D. 574 (E.D. Wash. 1975). *See H&D, supra,* 1998 WL 413772, *3 (stating that under the *Hearn* test a client waives the privilege if: "1) assertion of the privilege is the result of some affirmative act, such as filing suit, by the asserting party; 2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and 3) application of the privilege would have denied the opposing party access to information vital to his defense.").

The doctrine of implied waiver seeks to prevent clients from using the privilege as a "sword" instead of a "shield"–from selectively disclosing or refusing any disclosure to and thereby prejudicing an attorney's case. *See Bieter Co. v. Blomquist,* 156 F.R.D. 173, 179 (D. Minn. 1994); *Pappas v. Holloway,* 787 P.2d 30, 34 (Wash. 1990).

The Waite firm responds that it is not making an implied waiver argument, as that doctrine no longer exists in Ohio. According to the Waite firm, it cites implied waiver cases only to support its argument regarding the scope of the common law self-protection exception.

I find that the Waite firm does not rely on Davis's implied waiver of the attorney-client privilege. I agree with the Waite firm that pre-*Jackson* implied waiver cases applying the *Hearn* test are, however, relevant to understanding and interpreting the scope of the self-protection exception.

### 2. Self-Protection Exception:
### Squire Sanders

At issue in this case is the scope of the common law self-protection exception to the attorney-client privilege. Under this doctrine, "an attorney [may] testify concerning attorney-client communications when necessary to establish a claim for legal fees on behalf of the attorney or to defend against a charge of malpractice or other wrongdoing in litigation between the attorney and the client." *Squire Sanders, supra,* 127 Ohio St. 3d at 173. In *TattleTale Alarm Systems, Inc. v. Calfee, Halter & Griswold, LLP,* 2011 WL 382627, *5 (S.D.Ohio), the court explained the underlying basis for the self-protection exception:

> the Ohio Supreme Court has shown a tendency not to apply the privilege in cases where it would effectively prevent a party from proving his or her case because all, or at least the bulk, of the most relevant evidence is contained in privileged communications. This explains the creation of the self-protection, bad faith, and good faith settlement exceptions, because in each of those situations, absent the ability to discover or utilize otherwise privileged communications, the affected party lacks the ability to put on probative evidence in support of his or her claim or defense. Thus, these exceptions fall within a "rule of necessity" which values the ability to prove a particular claim over the protection usually afforded by the attorney-client privilege.

In *Squire Sanders*, the Squire Sanders law firm had served as outside counsel for the Giudvan Flavors Corporation until being fired. *Id.* at 162-63. Squire Sanders sued the corporation

10

for fees. *Id.* The corporation counterclaimed, alleging breach of contract, legal malpractice, breach of fiduciary duty, fraud, and unjust enrichment. *Id.*

The Supreme Court affirmed the trial court's decision to grant Squire Sander's discovery motion and compel current and former in-house counsel to testify and produce documents respecting: 1) budgeting and staffing of litigation, 2) trial strategy, 3) handling of witnesses, and 4) settlement opportunities. *Id.* at 163, 175.

The Court overruled the corporation's contentions that: 1) Ohio common law did not provide a self-protection exception to the attorney client privilege, and 2) *Jackson* stood for a general proposition that the had Court rejected all "waivers, exceptions, and limitations [to] testimonial privilege statutes." *Id.* at 164, 166.

The Court in *Squire Sanders* held Ohio common law recognizes a self-protection exception allowing an attorney to reveal "any confidences necessary to defend himself or herself or to vindicate his or her rights with regard to disputed claims," *Id.* at 169. The Court also held, "[w]hen the attorney-client relationship has been put at issue by a claim for legal fees or by a claim that the attorney breached a duty owed to the client, good cause exists for the discovery of work product to the extent necessary to collect fees or defend against claims." *Id.* at 175.

In affirming the decision to compel discovery, the Court affirmed the traditional doctrine that a privilege "cannot at once be used as a shield and a sword." *Id.* at 171.[15]

---

[15] Although the court did not further elucidate, other courts have found that a client attempts to use the privilege as a sword when he or she: 1) asserts the privilege to prejudice his attorneys case, or 2) selectively discloses certain communications for tactical advantage. *See Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1417 (11th Cir. 1994) (citations omitted).

The Waite firm asserts that the self-protection exception requires that Davis produce the requested documents and testimony. According to the Waite firm, its access to communications between Davis and counsel in the tax, real property, and close corporation agreement cases is indispensable to defending against Davis's counter-claims, particularly that of malpractice.

The Waite firm contends *Squire Sanders* supports its position. This is so, the Waite firm argues, because the Court in that case compelled discovery of "other-attorney communications" –communications between the client and the client's current and former in-house attorneys who were not accused of wrongdoing.

Davis responds that *Squire Sanders* does not permit courts to compel discovery of "other-attorney communications." According to Davis, the Court in *Squire Sanders*, in compelling discovery from in-house counsel, was compelling discovery from the client itself, not from a client's "other attorneys."[16]

Davis fears the Waite firm's interpretation of *Squire Sanders* would amount to an unprecedented extension of the self-protection exception. According to Davis, I should interpret

---

[16]Although the Magistrate Judge found this argument persuasive, the Court in *Squire Sanders* did not make this contention.

Moreover, the Waite firm counters Davis's claim that "in-house counsel is the client itself." According to the Waite firm, in-house client communications are no more or less privileged than communications between outside counsel and the client. *See State ex. rel. Leslie v. Ohio Housing Financing Agency,* 105 Ohio St. 3d 261, 265 (2005) (citing ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 3:14) ("the confidential communications between in-house counsel and the client are privileged to the same extent as communications between outside retained counsel and the clients who have consulted them for legal advice or assistance").

I find no significance in the fact that, in *Squire Sanders*, the communications at issue involved in-house counsel rather than outside counsel.

Ohio law as limiting the scope of the self-protection exception to its historic use–compelling discovery of communications between the client and the accused attorney.

In my view, the Court, in upholding generally the self-protection exception, did not reach the more narrow issue of the scope of discovery permitted under that exception. It thus did not decide whether an attorney may use the self-protection exception to reach "other-attorney communications."

### 3. "Other-Attorney Communications"

"In the event that the Ohio Supreme Court has not addressed a substantive issue, this Court must ascertain Ohio substantive law from all relevant sources." *Dolly v. Old Republic Ins. Co.,* 200 F. Supp. 2d 823, 829 (N.D. Ohio 2002) (citing *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000) ("When the state's highest court has not decided the applicable law, the federal court must ascertain the state law from all relevant data, including state appellate court decisions, supreme court dicta, restatements of law, law review commentaries, and the majority rule among other states.") (citations omitted)). "Decisions from intermediate state appellate courts are viewed as persuasive unless it can be demonstrated that the Ohio Supreme Court would decide the matter differently." *Sierra 76, Inc. v. TA Operating LLC,* 848 F. Supp. 2d 812, 815 (E.D. Ohio 2012) (citing *In re Dow Corning Corp.,* 419 F.3d 543, 549 (6th Cir. 2005).

The specific issues I must address include: 1) whether the self-protection exception can be used to compel discovery of "other-attorney communications;" 2) whether discovery of "other-attorney communications" is warranted on the particular facts of this case; and 3) the scope of discovery I should permit the Waite firm to obtain to establish fairly its claim for fees and, primarily, defend itself against Davis's counterclaims.

13

## A. The Pertinence of Implied Waiver Cases

Before determining whether the self-protection exception may be used to compel production of "other-attorney communications," it is helpful to consider the usefulness, if any, of the pre-*Jackson* implied waiver cases.

The Waite firm suggests that I look to the otherwise inapplicable implied waiver doctrine as a guide in deciding discovery disputes under the self-protection exception. It argues: 1) courts deciding discovery disputes in attorney's fees and malpractice cases oscillate between the terms "waiver" and "exception;" 2) the doctrines are functionally indistinguishable; and 3) both implied waiver and the self-protection exception further the same fundamental purpose–namely, enhancing fairness by enabling attorneys to gain access to evidence essential to a claim for fees or defense against alleged wrongdoing.[17]

Davis contends the Ohio Supreme Court drew a clear line in *Squire Sanders* between the self-protection exception and the doctrine of implied waiver. According to Davis, because the Court in *Squire Sanders* distinguished between the doctrines, I must infer that it is improper to consider implied waiver cases in deciding disputes under the self-protection exception.

While I must abide by Ohio's rejection of the implied waiver doctrine, I also note that, in deciding *Squire Sanders* the Court used a rationale functionally identical to that which Ohio's

---

[17] The Waite firm also cites one case applying the self-protection exception, not the doctrine of implied waiver. *Kalyawongsa v. Moffett,* 105 F.3d 283, 290-91 (6th Cir. 1997) (stating "other-attorney communications" would be accessible under Tennessee's self-protection exception). The Sixth Circuit in *Kalyawongsa* also held that "there is no requirement that the communications relate directly to fees, only that they be necessary to establish the fee or defend against accusations of wrongful conduct. *Id.*

14

appellate courts used when applying the doctrine of implied waiver. 127 Ohio St. 3d at  171 ("the

attorney-client privilege cannot at once be used as a shield and a sword").

Thus, although the doctrine of implied waiver no longer exists in Ohio, the policies

underlying that doctrine are the same as those underlying the self-protection exception to the

privilege. Deciding whether to allow an attorney to penetrate into a former client's otherwise

protected communications with other counsel turns on whether the attorney can fairly and

adequately protect himself or herself from claims of malpractice. *See id.* at 176 (noting that the

"information sought" related to "the pivotal issues" in the dispute over fees and the quality of the

firm's work). That being so, I can look to the facts and circumstances of the implied waiver cases,

without regard to the discarded legal doctrine on which those cases based their rulings.[18]

### B. Compelling Discovery of
### "Other-Attorney Communications"

---

[18] I disagree with the significance that Davis and the Magistrate Judge attribute to the
Court's distinction between the doctrines in *Squire Sanders*. The Court distinguished between
the doctrines only to make clear that it still had the power to use the self-protection exception to
compel disclosure in attorney fees and malpractice cases. The Court was clarifying that, by
repudiating common law implied waiver in *Jackson,* it had not also repudiated the common law
self-protection exception.      Although the Court compelled discovery under the self-protection
exception, it applied an implied waiver type approach. Doing so, it reasoned: 1) previously there
were two options for compelling discovery in attorney's fees and malpractice suits where
fairness so required; 2) the General Assembly decided to limit waiver; and 3) the self-protection
doctrine now serves as the only basis on which attorneys may seek to compel discovery in cases
challenging their entitlement to fees or asserting malpractice.

   Interpreted in this manner, I believe it is proper to look, as does the Waite firm, to cases
previously decided under the implied waiver doctrine for direction in resolving the present
dispute.  The facts of those cases matter; the legal doctrine the courts applied to those facts does
not.

Both parties cite to implied waiver cases from other jurisdictions to support their respective positions concerning the discoverability of the "other attorney communications" at issue in this case. I proceed to consider the cases to which each side points..

In *H&D*, *supra*, the only Ohio case involving "other-attorney communications," a debtor had purchased steel on credit from H&D. 1998 WL 413772, *1. H&D hired an attorney to secure the debt. *Id.* The debtor later filed bankruptcy and sought a determination that the debt it owed H&D was unsecured because H&D's security instrument was invalid. *Id.*

H&D retained new counsel to represent it in the bankruptcy dispute. *Id.*, *1. During settlement negotiations between H&D and its debtor, H&D's new counsel wrote a letter to the debtor's counsel addressing his view of the merits. *Id.* The parties eventually settled. *Id.*

After settling the security instrument dispute, H&D sued its former counsel. *Id.* at 1. In preparing to defend the malpractice claim, the accused attorney sought to compel production of the settlement letter. *Id.* The accused attorney argued the other attorney's settlement letter was vital to determining whether the client had settled the dispute for a reasonable amount. *Id.* at *4.

The court in *H&D* looked to the laws of other jurisdictions to decide whether the facts of the case justified compelling production of the "other-attorney communications." *Id.* at *4-5 (citing *Pappas v. Holloway,* 787 P.2d 30, 35-6 (Wash. 1990) (communications close in time and relevant to issue of liability discoverable) and *Jakobleff v. Cerrato, Sweeney and Cohn,* 97 A.D. 2d 834, 835 (1983) (communication relevant only to issue of damages not discoverable)). Ultimately, the court

in *H&D* declined to compel production of the other attorney's settlement letter. 1998 WL 413772, *6.[19]

I find that the Ohio Supreme Court is likely to adopt the court's approach in *H&D*.[20] Accordingly, in determining whether to compel discovery of the "other-attorney communications" in this case, I will: 1) determine whether the content and timing of the "other-attorney communications" are relevant to determining liability, and 2) weigh the benefit of protecting the privilege against the difficulty of discovering the facts relevant to liability by other means.[21]

The Waite firm asserts I should compel production of all documents and testimony relating to the other attorneys' representation of Davis in the tax, real property, and close corporation agreement cases. The Waite firm contends both *H&D* and the precedent of other jurisdictions support its request. This is so, it claims, because the other firms' representations of Davis: 1) were

---

[19] The court found: 1) the settlement letter was relevant only to the issue of mitigating damages/reasonableness of the settlement, not to the issue of liability for alleged malpractice; and 2) the document was not "vital" to the accused attorney's defense. *H&D,* 1998 WL 413772, *4 (stating "vital information necessarily implies that the information is unavailable from any other source."). The court stated that expert testimony could be used to attack the reasonableness of the settlement amount. *Id.*

[20] *See* Laurence A. Steckman & Richard Granofsky, *The Assertion of Attorney-Client Privilege by Counsel in Legal Malpractice Cases: Policy, Privilege, and the Search for Truth in Cases Involving Implied Waivers,* 45 Tort Trial & Ins. Prac. L.J. 839, 851-52 (2010). In general courts considering whether to compel production of "other-attorney communications" examine the communication's: 1) timing; 2) possible causal effect; and 3) relevance to the issue of liability–as opposed to damages. *Id.*

[21] The court in *H&D* also noted that properly analyzing whether to compel discovery requires considering how a client will attempt to prove malpractice on the facts of a particular case. *H&D,* 1998 WL 413772, *4. Specifically, the court stated it is necessary to consider the factual basis for each element of a malpractice claim: 1) duty, 2) breach of duty, and 3) causal connection between breach and loss. *Id.*

simultaneous;[22] 2) derived in large part from the same underlying complex business dispute; and 3) the requested documents and testimony are highly relevant to determining whether the firm is liable for breach of contract or malpractice.

Davis claims his other attorneys represented him in matters completely separate from the Waite firm's representation of him in the squeeze out case. According to Davis, his "other-attorney communications" are not relevant to the Waite firm's liability for breach of contract or malpractice because only what actually occurred–not what could have occurred–is relevant to determining liability.

I disagree. Davis claims broadly the Waite firm failed to fulfill its contractual and professional obligations to represent him in the other cases. As a result, he claims, he had to spend a lot of money that otherwise he would not have had to spend.

To determine whether that is so, and if so, what the Waite firm should and could have done, and the amount of ensuing damages, it is entirely appropriate to look at what the Waite firm could have done differently–*i.e.* how Davis and the other firms actually proceeded in contrast to how, according to Davis, the Waite firm would and should have proceeded. As aptly stated by the court in *Pappas, supra*, "[c]ontrary to the [client's] claim that the only information relevant to this issue is what actually happened, this inquiry will involve examining decisions made at various stages of

---

[22] Davis argues that the Waite firm failed to argue simultaneous representation in its motion to compel, and thus I should not consider the argument. According to Davis, simultaneity is synonymous with co-counsel of record.

Contrary to Davis's contention, the Waite firm argued simultaneous representation in its motion to compel. In that filing, the Waite firm noted, "many jurisdictions hold that a client is precluded from asserting a privilege to bar discovery from the client's other attorneys who were involved in the *underlying litigation or transaction that gave rise to accusations against the defendant attorney*." (Doc. 46) (emphasis added).

the underlying litigation . . . this is particularly true given [the accused attorney] was not the attorney who actually tried the case, nor did he have any part in its eventual settlement." 787 P.2d at 37.

Davis cites *H&D, Woodbury Knoll, LLC, et al. v. Shipman & Goodwin, LLP,* 48 A.3d 16 (Conn. 2012), and *Fischel & Kahn Ltd. v. van Straaten Gallery, Inc.,* 727 N.E.2d 240 (Ill. 2000), to support his contention that the court should not compel discovery of his "other-attorney communications."

In *Fischel* and *H&D* the clients retained attorneys to draft contracts on their behalf. Because of errors or omissions in drafting, third parties sued the clients. After settling that litigation, the clients in both cases sued the drafting attorneys for malpractice.

The client in *Fischel* sought to recover damages covering the amounts paid to defend the contract litigation and settle the disputes. 727 N.E.2d at 243. The accused attorney argued he needed access to the "other-attorney communications" to present his defense that the client had failed to mitigate damages. *Id*.

Finding the affirmative defense of failure to mitigate damages "insufficient to put the *cause* of [the client's] damages at issue," the court in *Fischel* did not compel the discovery. *Id.* at 244-45 (emphasis added).

In *Woodbury Knoll* the clients retained an attorney to represent them in certain real estate transactions. 48 A.3d at 19. The attorney failed to discover the fraudulent conduct of one of the parties before closing. *Id.* When third parties later discovered the fraud, they undertook foreclosure actions against clients. *Id.* The clients hired new counsel to represent them in the foreclosure proceedings. *Id.*

19

After resolving the foreclosure issues, the clients accused the real estate attorney of malpractice and sought to recover legal fees and settlement costs. *Id.* The accused attorney moved to compel production of the foreclosure attorney's documents to show the settlement was unreasonable. *Id.* Finding that "the fact finder should be able to assess *damages* adequately . . . without resorting to privileged communications," the court did not compel the discovery. *Id.* at 786 (emphasis supplied).

I find *H&D*, *Fischel,* and *Woodbury Knoll* distinguishable from the circumstances here.

The malpractice claims in *H&D, Fischel,* and *Woodbury Knoll* arose out of simple and isolated contract and real estate representations. In contrast, Davis's claims arise out of the Waite firm's representation of him in one of a set of inter-related and complex cases. Those cases arose, from or were ancillary to the CNG squeeze out case for which Davis retained the Waite firm. Moreover, Davis claims the Waite firm was duty-bound to represent him in the other cases.

This scenario, completely unlike those in the simple circumstances at issue in *Fischel* and *H&D,* is one of "compound" business litigation. As one author has argued persuasively, this situation justifies exposing a former client's "other-attorney communications." Katerina P. Lewinbuk, *Transformation of the Ethical Boundaries of the Attorney-client Privilege in Response to the Growing Complexity of the Modern Business World*, 42 Willamette L. Rev. 79, 82 (2006).

According to Professor Lewinbuk, discovery disputes in complex or compound business litigation call for flexible, case-by-case adjudication. A more restrictive approach would expose attorneys in the position of the Waite firm in this case to the "potential for automatic liability against the defendant attorney." *Id.* at 95, 98. Professor Lewinbuk concludes that client behavior that would

20

be impermissible in a "single representation scenario" should, on the same ethical grounds, be prevented in a multiple representation scenario. *Id.* at 94.[23]

Moreover, the malpractice disputes at issue in *H&D, Fischel,* and *Woodbury Knoll* are distinguishable on another ground. In those cases, it was undisputed that the sought after "other-attorney communications" could have had no bearing on the accused attorney's liability for malpractice. The attorneys in those cases sought discovery only to determine the reasonableness of damages or settlement amounts.

In contrast, in this case, the Waite firm contends the "other-attorney communications" are highly relevant to determining liability. I agree: most simply put, the complex nature of the inter-relationship between all four cases precludes barring *in toto* the discovery the firm seeks in its effort to defend against Davis's claims.

For these reasons, I do not find *H&D, Fischel,* and *Woodbury Knoll* support Davis's argument against compelling production.

I turn now to the authorities which the Waite firm cites.

In each of the implied waiver cases the Waite firm cites, the courts compelled discovery of "other-attorney communications." The courts did so because the complexity and overlap of the underlying representations made the "other-attorney communications" relevant to determining the accused attorney's liability for wrongdoing. *See Rutgard v. Haynes,* 185 F.R.D. 596, 599 (S.D. Cal. 1999); *Bieter v. Blomquist,* 156 F.R.D. 173, 178 (D. Minn. 1994); *Nat'l Excess Ins. Co. v. Civerlos, Hansen, & Wolf,* 139 F.R.D. 398, 401 (D.N.M. 1991); *Byers v. Burleson,* 100 F.R.D. 436, 439-40

---

[23] The Lewinbuk article applies an implied waiver analysis. Nonetheless, the policy grounds which she discusses for expanded discovery in "compound" business representation apply with equal force to Ohio's self-protection exception to the privilege.

(D.D.C 1983); *Zabin v. Picciotto*, 896 N.E.2d 937, 955 (Mass. Ct. App. 2000); *Pappas, supra,* 787 P.2d at 35-36 (Wash. 1990).

The malpractice claim in *Bieter* arose out of an unfair competition suit between developers. 156 F.R.D. at 178. After being sued for violating the Racketeer Influenced and Corrupt Organizations Act (RICO), Bieter sued former counsel for malpractice. *Id.*

Former counsel claimed that the another firm had also represented Bieter during various phases of his search for a site and eventual agreement to develop a Target store. *Id.* at 176. Contended that, "at the same time Dorsey was supposedly committing this legal malpractice," the other counsel was Bieter's 'actual counsel' and "was actively representing" Bieter "on precisely the same matters," Bieter sought documents from the other counsel to defend itself. *Id.*

The court in *Bieter* stated that the "issue is whether the waiver extends to documents generated by a non-party attorney who represented the client in the same transaction giving rise to the malpractice claim against the attorney named as defendant." *Id.* at 176. The court compelled production after concluding the documents sought were relevant to former counsel's liability for malpractice. *Id.*

The malpractice claim in *Pappas* arose out of complex litigation between a cattle company and several purchasers of diseased cattle. 787 P.2d at 199-200. In the 1970s, the client sold cattle infected with brucellosis. *Id.* Purchasers filed individual lawsuits against the client in two different counties. *Id.* The courts later consolidated the suits. *Id.* at 200.

The client employed several attorneys to defend the lawsuits. *Id.* at 200. They hired: 1) Fagerness to represent them in one county; 2) Pappas to represent them in the second county; 3) Pappas to represent them in the consolidated action; 4) Thompson to assist in the consolidated

22

action; and 4) Shepherd and Abbott to assist with trial. *Id.* With the court's permission, Pappas withdrew shortly before the case went to trial. *Id.* Thompson represented the client through trial, appeal, and eventual settlement. *Id.*

When Pappas sued for fees client asserted seven malpractice counterclaims. *Id.* at 200-01. Pappas sought the documents the other attorneys' created during their representation of the client. *Id.*

Compelling discovery of the "other-attorney communications" and work product, the court noted that Pappas had not participated in trial or eventual settlement. *Id.* at 200. This, according to the court, made discovery of the work product for these phases even more vital. *Id.* at 209. The court held that the other attorneys' trial and settlement materials were highly relevant to the issue of Pappas's liability for malpractice. *Id.* at 206. Given the complex nature of the suit, the court noted that determining his liability would involve "examining decisions made at various stages of the underlying litigation." *Id.* at 209.

In *National Excess* the accused attorney had represented an insurance company at trial, which had resulted in an unfavorable verdict. 139 F.R.D. at 400. The insurance company subsequently accused former counsel of malpractice. *Id.* The attorney defended defendant, *inter alia,* on the basis of causation and comparative negligence. *Id.*

The court found the accused attorney's defenses were rooted in the contention that the insurance company "began seeking legal advice from [other attorneys] . . . shortly after they jury's . . . verdict." *Id.* The court rejected the insurance company's contention that "communications are discoverable only if the attorney is [actually] hired to represent the client in the underlying action." *Id.* In addition, the court stated that although communications after the alleged negligence occurred

could not be directly relevant to causation, "[n]evertheless, the documents might be construed to bolster oral testimony in support of [former counsel's] claims that [subsequent counsel] was acting as a shadow counsel" when the case was being litigated. *Id.* at 401.

In *Rutgard* the accused attorney represented an employer in a civil anti-trust action against the client's former employees. 185 F.R.D. at 597. After the completion of the anti-trust suit, the employees sued both the employer and trial attorney for malicious prosecution. *Id.* The client hired new counsel to represent him in the malicious prosecution suit. *Id.* He later sued the trial attorney to recover attorneys fees paid both to defend and settle the malicious prosecution suit. *Id.*

The court ordered production of all documents relating to the malicious prosecution suit. *Id.* In so ordering, the court defined the "underlying action" during which "issues of proximate cause [could] arise" to include "both the antitrust case and the malicious prosecution case." *Id.* at 599. According to the court, because the client's allegations put the reasonableness of the settlement in issue, the former attorney could make a reasonable allegation that his liability turned on the underlying actions of subsequent counsel. *Id.*

In *Byers* the accused attorney represented the plaintiff in a medical malpractice case. 100 F.R.D. at 438. Subsequent counsel completed the representation. *Id.* After the court entered summary judgment against the plaintiff, she brought a malpractice suits against her first attorney in both state and federal court. *Id.*

In the federal case, the accused attorney asserted a statute of limitations defense. *Id.* To support his defense, the accused attorney moved to compel the subsequent attorney's records from both the medical malpractice action and the state legal malpractice action. *Id.*

24

The court rejected the client's contention that it could decide the statute of limitations issue without inquiring into the client's "subjective and objective knowledge." *Id.* at 439. The court held that fairness required allowing the accused attorney access to the requested documents. Thereby, he could "respond with facts which answer [the] precise issue" of whether the client knew or should have known she had a legal malpractice claim outside the limitations period. *Id.* at 440.

The malpractice claim in *Zabin* arose from a series of personal injury actions. 896 N.E.2d at 945. Emissions from a leather processing plant had injured a neighboring company and its owners. *Id.* They sued and won. *Id.* Before affirmance on appeal, the clients asked trial counsel to file two more complaints on behalf of their daughters. *Id.* at 946. After filing, trial counsel determined there was insufficient medical evidence to substantiate the claims and withdrew. *Id.*

After withdrawing, trial counsel filed a complaint against the leather plant and its insurance company seeking to collect the judgement and claiming unfair claims settlement practices. *Id.* at 945. The leather plant sought bankruptcy protection. *Id.*

The clients sued trial counsel for malpractice and hired bankruptcy counsel. *Id.* at 945. In total, the clients hired five attorneys to represent them in various actions spanning fifteen years. *Id.*

Less than a year after fifth counsel began representing the clients, the insurance company offered to pay the clients nine million dollars in full settlement of all claims if the clients worked out any attorneys fee liens in advance. *Id.* at 947.

The clients were unable to reach an agreement with the attorneys. *Id.* at 947.  The insurance company interpleaded the attorneys, the court realigned the parties, and a lengthy trial between the former attorneys and the clients ensued. *Id.*

The clients argued that the first four attorneys efforts contributed minimally to the ultimate settlement. *Id.* at 955. According to the clients, the fifth attorney independently negotiated the settlement. *Id.*

Former counsel sought extensive discovery. Expansively construing "underlying litigation" to include a series of related proceedings, the court held that "other-attorney communications" were discoverable. *Id.* According to the court, "the nature of defendants' allegations placed the work the [fifth attorney] performed directly at issue, and [the fifth attorney] was the only source available to testify regarding the work she performed." *Id.*[24]

The factual circumstances in the cases the Waite firm cites are more analogous to those in this case than those Davis cites. Based on a review of depositions and emails, I find that all four suits in this case could be construed to be part of an overarching dispute over control of CNG.

Moreover, the hundreds of emails submitted to the court for *in camera* review belie Davis's contention that the various attorneys worked, with the exception of logistical matters, independently.

The emails reflect rather that the collectively attorneys acted as "shadow counsel" in each other's cases..The attorneys: 1) edited one another's motions; 2) exchanged copies, thoughts, and strategies for depositions; 3) entered a formal agreement allowing attorneys in the tax case to use materials from the squeeze out case; 4) reviewed one another's personal notes on case strategy; 5) held meetings to discuss case strategies/theories; 6) jointly represented Davis's interests in

---

[24] The court noted that the trial court appropriately excluded testimony and documents relating to the preparation of the malpractice case itself. *Id.* at 955.

arbitration and mediation proceedings; and 7) as to the Baker firm, acted as successor counsel in the ultimate sale of Davis's shares.[25]

I further find that several of the documents produced for *in camera* review are highly relevant to determining liability. Davis's breach of contract claim rests on the contention that the tax litigation was a simple general business matter, and therefore the Waite firm had a duty to undertake the representation. In essence, Davis is arguing that the parties intended to include "simple" tax issues within the scope of their original contingent fee agreement because they "related to his CNG investments."[26]

Several documents produced for *in camera* review indirectly undermine Davis's contention that the Waite firm had a duty to represent Davis in the tax case. One email from the Shumaker firm to the Baker firm explicitly states the firm's view that the tax case was both substantively and procedurally complex.[27] Davis also was involved in more than one lengthy pre-trial communication

---

[25] Davis exchanged several emails with the Waite firm discussing the sale of his shares. In an email Davis has already produced, he suggests using one individual as a "stalking horse" to attract higher bidders for his shares. This email appears to contradict Davis's contention that the Waite firm attempted to swoop in at the last minute to act as a stock broker and avoid having to do legal work.  It also indicates the very active role that Davis took in overall management of his multi-front battles

[26] Courts elsewhere have compelled production of "other-attorney communications" after finding the communications necessary to determining the intent of parties in contracting. *See Medtronic, Inc. v. Intermedics, Inc.,* 162 F.R.D. 133, 135 (D. Minn. 1995) (communications not necessary to determining intent because meaning appears obvious from four corners of the contract); *St. Louis Convention and Visitors Commission v. National Football League, et al.,* 1997 WL 1419394 *3-4 (E.D. Missouri) (same); *see also Pitney-Bowes, Inc. v Mestre,* 86 F.R.D. 444, 447 (S.D. Fla. 1980) (communications discoverable because they were necessary to determining the "intent of the parties with regard to construction of certain terms of the Agreements.").

[27] For example, in on email counsel from Shumaker stated, *inter alia*:

[T]his appears to be anything but a routine Tax Court case since so few of the facts will be stipulated. Therefore, I am wondering to what extent we should offer you the services of Phil

with I.R.S. attorneys and actively participated in the drafting process leading to a 300 page brief in the tax court matter.

These documents suggest the tax matter was a separate and complicated, albeit related proceeding, and that Davis and the Waite firm did not intend to include it within the scope of their agreement.

Several emails produced for *in camera* review are also relevant to the issue of breach.

In his breach of contract claim, Davis represents that he pleaded with the Waite firm to represent him in the tax, real property, and close corporation cases and repeatedly requested that the Waite firm assert equalization claims in the squeeze out case.

Contrary to Davis's assertion, I find that wording, and, indeed, the tone, of his emails indicate that he, of his own initiative, sought specialized tax counsel with whom he had an already established relationship.[28]

Several emails refer to the good working relationships between the firms and the firms efforts to keep the tax issues separate from the issues being litigated in the squeeze out case. Moreover, in one of the emails already produced to the Waite firm, Davis, addressing both the Shumaker and the

---

Campbell since he is now running with many of the side litigation matters that Allen has pending. Phil is the chair of our litigation dept. Here in Tampa. Also, Phil and Jim Cummins have developed a good working relationship so Phil could call on Jim if needed.

[28] The depositions produced suggest Davis may have done the same with respect to the property case. The deposition of Davis's son shows Davis had previously used the Livingston firm to complete another property transaction in Florida. Although not direct evidence, this lends support to the Waite firm's contention that the parties did not intend to include Florida property disputes in their engagement agreement–Davis already had local property counsel–and that the Waite firm did not breach the agreement and Davis sought the Livingston firm's representation on his own initiative.

Waite firm, stated he was seeking the assistance of the Baker firm because the firm had previously handled his tax matters. In the same email Davis stated that he will pay the Baker firm's fee.

Several emails evidence Davis's oversight of his cases. Davis: 1) arranged attorney meetings and exchange of filings; 2) edited court motions; 3) wrote draft settlement agreements; and 4) suggested lines of questioning for depositions. I found no emails, on the other hand, indicating that Davis reached out to the Waite firm before retaining other counsel for the tax, real property, and close corporation agreement cases.

I have completed *in camera* review of the thousands of pages of documents submitted for that purpose. I conclude: 1) the attorneys provided simultaneous and overlapping representations in separate lawsuits, all of which arose from a single compound and complex business dispute; 2) counsel in the various cases worked in a coordinated manner toward the common goal of achieving positive outcomes for their shared client, even though the specific subject matters and venues differed; 3) Davis played an active role in overseeing all the lawsuits and counsel; and 4) the "other attorney communications" produced for *in camera* review are relevant to liability.

I find, accordingly, that the self-protection exception to the attorney-client privilege and attorney work product doctrine supports the Waite firm's demand for extensive discovery into otherwise privileged communications. That I view these circumstances through the lens of that exception, rather than that of implied waiver, does not matter. The result is the same here as in the implied waiver cases from other jurisdictions.

The Waite firm can only defend against Davis's multiple claims of misconduct by having access to Davis's "other-attorney communications" in the related cases. This is especially so given Davis's claim that the Waite firm abruptly refused to represent him in those cases. Most simply put,

29

a reading of the materials produced for *in camera* review discloses information and evidence that might be of considerable assistance to the Waite firm and, it is likely, admissible at trial.

Though this looked like a fishing expedition in off-limits waters, it turns out not to be that kind of unlicensed excursion. Much of what's there to be caught and captured appears to belong in the Waite firm's net.

### Scope of Discovery:

I conclude that all of the material submitted for *in camera* review is discoverable. This is so for three reasons: 1) all of the documents produced are relevant to determining liability; 2) the documents relevant to the damage issue are also relevant to the issue of liability; and 3) expert testimony will be insufficient to adequately determine the reasonableness of damages in this case.

It would be an arduous and futile task for me to try to delineate, by number, each discoverable communication. So I decline to do so in the first instance.

All of the documents produced could be used either individually or severally to directly or indirectly dispute one of the two issues of liability in this case: 1) breach, or 2) causation.

The issue of breach concerns whether Davis and the Waite firm intended to include collateral business disputes similar to the tax, real property, and close corporation agreement cases within the scope of their contingent fee agreement. Documents relevant to establishing the complexity or collateral nature of these disputes, and thus the parties intent not to include them within their agreement include: 1) depositions of auditors, Davis's sons, and other CNG employees; 2) Davis's lengthy informal discovery with the I.R.S.; 3) case filings; and 4) Davis's communications with his other attorney's in these cases.

30

These documents tend to show that the tax and real property litigation were distinct and complicated matters, which called for lawyers with specific tax expertise or local property law knowledge. Accordingly, the parties were unlikely to have contemplated their inclusion in the original fee agreement.

The issue of breach concerns whether, because of the specialized nature of the tax and property cases, Davis, on his own initiative, sought specialty counsel immediately instead of reaching out to the Waite firm. To the extent Davis, on his own initiative, made a rational business decision to seek specialty counsel instead of using general corporate counsel, the Waite firm cannot be said to have breached the fee agreement. It had no notice that Davis desired to have the firm represent him in the specialized matters, or, alternatively, to have the firm seek co-counsel to cover the matters.

As alluded to above, both the emails and depositions produced for *in camera* review tend to show that Davis reached out to specialty counsel with whom he had an established relationship rather than asking the Waite firm, a general corporate litigation firm, to represent him in tax and property matters requiring either specialized or localized knowledge.

In addition, even if Waite were found liable on one or more of Davis's claims, he still must prove the damages resulting from his having to hire other counsel. To recover those damages, Davis must prove not just the underlying obligation, but what Waite should have done and how and why it would have been as or more successful as the work other attorneys did, and cost less than they spent and charged. This fact alone, under the circumstances of this case,[29] entitles Waite to extensive

---

[29] As discussed previously, the Ohio appellate court in *H&D,* and the courts in the *Fischel* and *Woodbury Knoll* cases Davis cites, declined to compel production of "other-attorney communications," because the communications were relevant *only* to the issue of damages.

insight into what the other lawyers did, what they and Davis discussed about what they were doing,

and their thought processes about why they were doing it.

---

In this case, however, the communications are relevant both to liability and damages. Moreover, this case is distinguishable from *H&D*, *Fischel,* and *Woodbury Knoll* on an additional ground. The clients in those cases sought to recoup additional attorney's fees expended on collateral litigation. The clients did not, however, allege that the accused attorney had a duty to represent them in the collateral matters. The clients alleged solely that errors or omissions in the accused attorneys' representations caused them to have to incur additional attorneys fees.

Davis, in contrast, alleges that the Waite firm did have a duty to represent him in the tax, real property, and close corporation agreement cases. As such, numerous documents that may have been deemed relevant only to the issue of damages in other cases are, in this case, also relevant to the issues of breach and causation– the issues of whether: 1) Davis and the Waite firm intended to include tax and other matters in their agreement; and 2) Davis, of his own initiative, sought specialized counsel.

Finally, the court in *H&D* determined that communications relevant only to the issue of damages were not "vital" to the accused attorneys defense in that case because the parties could use expert testimony to present their arguments about the reasonableness of the settlement. In this case, however, expert testimony is unlikely to be sufficient. Although individual experts may be able to testify as to the reasonableness or likely outcomes of the separate disputes between Davis and CNG, an expert is unlikely to be able to provide insight into the reasonableness of the global settlement Davis and his sons eventually established.

Moreover, unlike in *H&D,* denying the Waite firm access to the communications, depositions, case filings, and the settlement document places the firm at a significant disadvantage. Without these documents, and the associated testimony, the parties are left to argue in the abstract regarding whether it is common practice to include collateral small business disputes within the scope of an agreement covering a shareholder squeezeout suit. Absent the privilege, however, Davis is forced to contend with what appear to be strong indications that his theory of liability is untenable–that the parties did not intend to include the collateral disputes within their agreement and Davis, on his own initiative, reached out to specialized counsel rather than asking the Waite firm to undertake the additional cases.

Accordingly, upholding the privilege does not just shield Davis– equally disadvantage both Davis and the Waite firm. Instead, allowing Davis to withhold access to his "other-attorney communications" gives him a significant tactical advantage– it allow his expert to start from the same starting line without first overcoming the hurdles presented by the documents and testimony that conflict Davis's theory of liability.

Without the insight it can gain only through the extensive discovery I am allowing, the Waite firm simply cannot fairly and specifically defend against Davis's claim with regard to liability or the putative damages Davis claims to have incurred.

This is a broad net; but not more broad than what Davis has put into issue in his counter-complaint. The Waite firm must have a fair opportunity to defend specifically against Davis's claims. To decide otherwise would allow Davis to strike freely at the Waite firm, while leaving the firm potentially unarmed and unable to respond effectively in kind.

In other words, Davis would have both a sword and shield, while the Waite firm would have neither.

## Conclusion

For the Foregoing reasons, it is hereby:

ORDERED THAT:

1. The Order of the Magistrate Judge (Doc. 55), be, and the same hereby is vacated; and

2. The motion of the plaintiff/counter-defendant to compel (Doc. 46) be, and the same hereby is granted as provided herein.

The Clerk shall schedule a status/scheduling conference.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

33