**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Waite, Schneider, Bayless                                    Case No. 1:11CV851
      & Chesley Co., L.P.A.,

          Plaintiff

      v.                                                    **ORDER**

Allen Davis,

          Defendant

      In this suit by a law firm to collect unpaid fees from a client, the client has brought a counterclaim for legal malpractice.

      Defendant/counter-claimant Allen Davis, a former client of plaintiff Waite, Schneider, Bayless & Chesley Co., L.P.A., alleges the firm committed malpractice by refusing to represent him in three disputes Davis had with his sons and CNG Financial Corporation, a closely held corporation the Davis family controlled. Davis also contends the firm negligently handled the one case in which it represented Davis – namely, a suit against CNG and Davis's sons in the Common Pleas Court of Hamilton County, Ohio.

      Pending is Waite, Schneider's motion for summary judgment on Davis's malpractice claims. (Doc. 116). For the following reasons, I grant the motion.

**Background**

      Davis was a minority shareholder in CNG, a company providing short-term payday loans. His sons Jared and David were the majority shareholders.

By 2004, manifold and substantial disagreements had arisen between Davis and his sons regarding the management of CNG's business.

One of these disputes involved the tax treatment of a CNG stock option Davis had exercised. Davis contended the option was not compensation for services he provided to CNG, and thus was not taxable to him as gross income. His sons asserted the option was for services rendered and, as such, CNG was entitled to claim a deduction for the payment to Davis.

Davis and his sons also quarreled over whether the sons had violated CNG's close-corporation agreement. The agreement entitled Davis, Jared, and David to equal payment, but Davis suspected CNG had short-changed him by paying the sons "guarantee fees" on certain debt obligations unrelated to CNG's business.

A third dispute involved the sons' alleged self-dealing at CNG's expense. Davis believed Jared and David had diverted a corporate investment opportunity for their own benefit. He also thought his sons had engaged in non-arm's-length transactions with CNG by loaning money to the company at exorbitant interest rates.

As a result of these disputes, Davis retained Waite, Schneider in August, 2004. He wanted representation "in connection with pursuing all of [his] claims against his sons and CNG." (Doc. 93 at 3). The parties formalized their relationship in an engagement letter specifying the firm would represent Davis on a contingency-fee basis.

Shortly thereafter, Waite, Schneider attorney Jim Cummins sent a demand letter to CNG outlining and seeking a resolution of all Davis's claims – including the tax claim, the close-corporation-agreement claim, and the self-dealing claim – against his sons and the company. When CNG rejected Davis's demand, Waite, Schneider started litigation.

### A. Hamilton County Litigation

In February, 2005, Waite, Schneider sued CNG and Davis's sons in the Hamilton County Court of Common Pleas. The complaint sought a declaratory judgment that Davis had not received the stock option as compensation. In October, 2007, the court granted a preliminary injunction forbidding CNG to distribute dividends; thereafter, Waite, Schneider tried to use the injunction to force a settlement with CNG.

Of note to the present litigation, the Hamilton County complaint did not plead any of the claims for money damages that Cummins had outlined in his demand letter to CNG. Davis pressed Waite, Schneider to explain why it had not raised those claims, but the firm "failed to address [Davis's] inquiries and demands." (Doc. 138 at 11). Davis, himself an attorney, became so alarmed by Waite, Schneider's failure to pursue these claims that, in April, 2006, he drafted and sent the firm a proposed amended complaint setting out those claims.

Despite this rather novel act on the part of its client, Waite, Schneider did not move to amend the complaint until March, 2009; the court denied the motion in November, 2010. In the meantime, CNG and Davis's sons had counterclaimed against Davis for money damages.

As the case proceeded toward an April, 2011 trial date, Davis grew concerned by what he perceived as Waite, Schneider's failure to prepare for trial. Davis also complained to Waite, Schneider that its attorneys were "unresponsive to his increasingly-urgent communications" about the case. (*Id.* at 13).

### B. Waite, Schneider Refuses to Represent Davis

With the Hamilton County case already underway, Davis became entangled in litigation with CNG in three separate forums.

The first matter – the "Sarasota Litigation" – was a lawsuit CNG filed in 2005 in the Circuit Court of Sarasota County, Florida. The complaint alleged Davis had breached his fiduciary duty to the company by "misappropriating CNG funds in conjunction with a real estate transaction." (Doc. 118-26 at 30). Believing his engagement letter with the firm entitled him to do so, Davis called on Waite, Schneider for representation in that litigation. In October, 2005, the firm refused to represent him, and Davis retained the law firm Livingston, Patterson & Strickland to handle the matter at an ultimate cost of more than $250,000.

The second matter – the "Tax Court Litigation" – arose in 2006, after the Internal Revenue Service issued deficiency notices to Davis and CNG over the inconsistent tax treatment of Davis's stock option.

Again relying on his understanding of Waite, Schneider's engagement letter, Davis approached the firm about this litigation. Once again, the firm declined to represent him. It told him its lawyers were not qualified "to handle such specialized litigation." (Doc. 93 at 8). In May, 2006, Davis retained Baker, Hostetler to represent him in the Tax Court; he paid the firm more than $4.5 million in fees in an ultimately unsuccessful effort to show the option was not taxable as gross income. *Davis v. C.I.R.*, 716 F.3d 560 (11th Cir. 2013).

The third matter – the "Close Corporation Litigation" – was a suit Davis's sons brought in April, 2010, seeking to invalidate CNG's close-corporation agreement because of their father's alleged misconduct. As it had before, Waite, Schneider refused Davis's demand for representation. Davis then retained Schumaker, Loop, and Kendrick at further expense to himself.

Davis's attorneys at Schumaker filed a counterclaim, alleging Davis's sons had: 1) violated the close-corporation agreement by failing to ensure Davis received equal pay from CNG; and 2)

breached their fiduciary duties by trying to "squeeze out" Davis, the minority shareholder. (Doc. 118-26 at 34).

In the present case, the parties dispute whether the counterclaim in the Close Corporation Litigation encompassed Davis's allegations about his sons' self-dealing. At his deposition, Davis testified the counterclaim included all claims for monetary damages he had against CNG. But he later testified there were some claims against CNG that he did not include in the counterclaim.

Waite, Schneider contends the counterclaim encompassed the self-dealing claim, but it does not cite any language in the counterclaim to support its contention.

### C. Settlement with CNG

In early 2011, a CNG minority shareholder approached Davis to discuss a global settlement with his sons and CNG of all litigation (except the Tax Court Litigation). Davis was interested and so informed the many attorneys representing him.

Around this time, however, Davis reiterated his lack of confidence in Waite, Schneider. On January 31, 2011, Davis engaged Baker, Hostetler to "monitor[ ] Waite, Schneider to insure the firm adequately represents me" in the Hamilton County case. (Doc. 116 at 28). Davis's email records show that he wanted Baker, Hostetler "to assist me in managing and preparing for Ohio proceedings scheduled for trial [in] April 2011." (Doc. 115-33 at 1). He informed Waite, Schneider of this monitoring arrangement on February 4.

Meanwhile, CNG had conditioned its willingness to enter settlement talks on Davis's dissolving the dividend injunction in Hamilton County. The company later represented it would also agree to dismiss the Hamilton County case entirely if Davis dissolved the injunction.

Being amenable to this proposal, Davis instructed Waite, Schneider to dissolve the injunction. But the firm so vigorously resisted this request that one Waite, Schneider attorney, Stanley Chesley, told Davis on March 17, 2011, that the firm would not represent him if he insisted on dissolving the injunction. That evening, Davis emailed Chesley and Cummins to acknowledge their withdrawal from the representation and again instructed them to dissolve the injunction.

The next day, Chesley appeared in the Hamilton County Common Pleas Court and filed a stipulated dismissal, which he signed as "Counsel for Plaintiff Allen L. Davis." (Doc. 138-1).

In time, father, sons, and company reached a global settlement, and did so without assistance from Waite, Schneider. As part of this settlement, Davis dismissed his counterclaim against the company in the Close Corporation Litigation.

### D. Malpractice Allegations

In 2011, Waite, Schneider brought this suit against Davis for not paying the firm for its work in the Hamilton County case. On February 20, 2012, Davis counterclaimed for malpractice.

Davis alleged Waite, Schneider negligently handled the Hamilton County Litigation by failing to: 1) raise any claims for money damages (i.e., the claims that Davis's sons had violated CNG's close-corporation agreement and engaged in self-dealing); and 2) prepare adequately for trial. He also contended Waite, Schneider committed malpractice by refusing to represent him in the Sarasota, Tax Court, and Close Corporation Litigations, all of which – according to Davis – were within the scope of the firm's engagement letter.

Waite, Schneider has now moved for summary judgment on the malpractice claims.

Its primary argument is that the claims are untimely because each accrued more than a year before Davis filed his counterclaim. Waite, Schneider also contends no reasonable jury could find

for Davis on the Hamilton County malpractice claim because: 1) Davis has no evidence that Waite, Schneider's malpractice damaged him; 2) even if Davis could show damages, they are incalculable and purely speculative; and 3) Davis has no evidence the firm's acts or omissions proximately caused his alleged damages.[1]

## Analysis

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### A. Statute of Limitations

Ohio law provides a one-year statute of limitations for malpractice claims. *See* O.R.C. § 2305.11(A). The limitations period begins on the later of two dates: namely, when either "there

---

[1] Davis also claimed that a supplement to his fee agreement created a conflict of interest for Waite, Schneider, and that the firm inappropriately disclosed proprietary information about Davis. Waite, Schneider sought summary judgment on these claims, but Davis's opposition did not respond to its argument. Given that failure, I deem as undisputed the facts showing these claims accrued in August, 2005, *see* Fed. R. Civ. P. 56(e)(3), and therefore grant summary judgment for Waite, Schneider on statute-of-limitations grounds.

is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act," or "the attorney-client relationship for that particular transaction or undertaking terminates[.]" *Zimmie v. Calfee, Halter, & Griswold*, 43 Ohio St. 3d 54, syllabus (1989).

Because Davis filed his malpractice claims on February 20, 2012, summary judgment is warranted only if no reasonable jury could find the claims accrued on or after February 20, 2011.

### 1. Cognizable Event

"A cognizable event is an event sufficient to alert a reasonable person that in the course of legal representation his attorney committed an improper act." *Chinese Merch. Assoc. v. Chin*, 159 Ohio App. 3d 292, 295 (2004). "Ohio law requires only constructive knowledge of facts, rather than actual knowledge of their legal significance . . . to start the statute of limitations." *FDIC v. Alexander*, 78 F.3d 1103, 1107 (6th Cir. 1996).

Davis does not dispute that the cognizable events giving rise to his malpractice claims occurred more than a year before he filed his counterclaim.

Here, Davis was on notice of Waite, Schneider's alleged malpractice in the Hamilton County Litigation as early as February 22, 2005.

On that date Waite, Schneider initiated litigation against CNG, but sought only declaratory and injunctive relief. Moreover, in April, 2006, Davis was so concerned about Waite, Schneider's omission of his claims for money damages that he included those claims in his proposed amended complaint and urged the firm to file that pleading. And by November, 2010, Davis knew the Common Pleas Court had denied Waite, Schneider's motion to amend, thereby precluding any hope of monetary recovery in the Hamilton County case.

Given this undisputed evidence, a reasonable jury could only find that Davis's malpractice claim based on the Hamilton County Litigation accrued, at the very latest, in November 2010, more than a year before he filed his counterclaim.

Nor is there any dispute that, long before the February 20, 2011, filing date of his counterclaims here, Davis knew of Waite, Schneider's malpractice *vis-a-vis* the non-Hamilton County matters. The record shows Waite, Schneider refused to represent Davis: 1) in the Sarasota Litigation sometime in October, 2005; 2) in the Tax Court Litigation in 2006; and 3) in the Close Corporation Litigation in June, 2010. Shortly after these dates, moreover, Davis retained new counsel to represent him in these matters.

Accordingly, Davis's claims are timely only if they accrued under the termination rule on or after February 20, 2011.

### 2. Termination of the Attorney-Client Relationship

Under the termination rule, the limitations period starts to run "when the attorney-client relationship for that particular transaction or undertaking terminates." *Omni-Food & Fashion, Inc. v. Smith*, 38 Ohio St. 3d 385, 388 (1988). "Stated differently, the statute of limitations is tolled from the date of . . . the alleged malpractice until the representation terminates." *Johnson v. Lapin*, 1995 WL 681102, *1 (N.D. Ohio).

A malpractice claim does not accrue when all the lawyer's work for the client ends, but rather when the lawyer's work on a "particular transaction or undertaking" concludes. *Id.*; *see also Alexander*, *supra*, 78 F.3d at 1110-11 (lawyer's "general relationship" with client after committing malpractice in discrete transaction did not toll limitations period for malpractice claim related to discrete transaction).

9

A tolling standard based on ongoing "general representation" of a client, the Ohio Supreme Court has explained, would "defeat the purpose of the statute of limitations where . . . a client with knowledge of the attorney's malpractice may unduly perpetuate the attorney's potential liability and exposure to suit." *Omni-Food*, *supra*, 38 Ohio St. 3d at 387-88.

Davis's malpractice claim has multiple components: some concerning Waite, Schneider's handling of the Hamilton County litigation, and others concerning the firm's refusal to represent him in the Sarasota, Tax Court, and Close Corporation matters.

The question therefore arises whether these matters are components of a single undertaking – spokes, in effect, joined to the same hub – or separate transactions – severed links, at best, in a former chain. *Cf. Accelerated Sys. Integration Inc. v. Ritzler, Coughlin & Swansiger, Ltd.*, 2012-Ohio-3803, ¶44 (Ohio App.) ("Before analyzing the issue of when the statute of limitations began to accrue based on a termination of the attorney-client relationship, we must first consider if [counsel's] representation embodied one or two separate undertakings or transactions.").

The answer to this question controls how much of Davis's case survives the statute-of-limitations challenge.

As I explain below, there is a factual dispute as to whether the parties' relationship with respect to the Hamilton County transaction extended into March, 2011, in which case that portion of Davis's counterclaim would be timely. And if the evidence shows either that all four matters are part of a single undertaking, or that the cases in which Waite, Schneider refused to represent Davis relate to the Hamilton County litigation, then Davis's refusal-to-represent claims would also be timely.

10

### a. Separate or Related Undertakings

For purposes of the termination rule, a particular transaction "encompasses all dealings related to the proceeding in which the malpractice occurred that are not of a general nature." *Slavens v. Spetnagel*, 1996 WL 422499, *5 (Ohio App.).

Waite, Schneider argues that "[t]he legal representations alleged in Davis' Counterclaim embody one or more separate and distinct 'undertakings' or 'transactions.'" (Doc. 116 at 20). But the firm presents little argument or explanation as to why the four matters – all relating to corporate control – are unrelated.

Davis's position, however, is even less persuasive. According to Davis, "[t]he basic factual flaw" in Waite, Schneider's argument is that it assumes "the scope of Waite, Schneider's representation was limited to [representing Davis] in the Hamilton County Action." (Doc. 138 at 18). Davis argues that, "[o]bviously . . . if the scope of Waite, Schneider's representation included the [Sarasota, Tax Court, and Close Corporation matters], the Hamilton County Action and the [other matters] are part of a single undertaking." (*Id.*).

This contention fails for two reasons.

First, Waite, Schneider's motion assumes *arguendo* that it was obligated to represent Davis in the cases outside Hamilton County, but argues that each matter constitutes a separate transaction with its own accrual date. The firm's response, in effect, accepts Davis's contention as to the scope of the representation.

Second, what matters is not the scope of the engagement letter, but whether the matters the firm agreed to handle are parts of a single transaction or, instead, separate transactions. Davis's argument is thus misfocused: if accepted, his argument would substitute an "engagement letter" test

11

for the Ohio Supreme Court's "particular transaction or undertaking" test. This is not the law in

Ohio,[2] and Davis cites no authority supporting his position.

As the parties have given me little to go on in deciding whether the Hamilton County matter

is "related to the proceeding[s] in which [Waite, Schneider refused to represent Davis]," *Slavens*,

*supra*, 1996 WL 422499, at *5, I turn to the case law.

### i. Ohio Cases

State and federal decisions from Ohio do not specify what factors a court should consider in

deciding whether two or more matters are related and how tight the relationship must be to find they

stand as a single transaction, rather than separate transactions. Rather, courts have adopted particular

rationales on a case-by-case basis.

For example, one court has held that a proceeding is not "related to" the case in which the

malpractice occurs unless the lawyer revisits that case to "fix, alter or renegotiate" the work giving

rise to the malpractice claim. *Capital City Energy Group, Inc. v. Kelley Drye & Warren, LLP*, 975

F. Supp. 2d 842, 854 (S.D. Ohio 2013).

Another court has determined the parties' course of conduct can establish that a

representation beginning as a single undertaking later became two unrelated transactions.

*Accelerated Sys.*, *supra*, 2012-Ohio-3803, at ¶47 (although representation of client "originated as

[one] 'particular undertaking,'" representation "did not continue that way").

_____

[2] Suppose that a law firm signed an engagement letter agreeing to represent a client in a divorce proceeding in Ohio and an entirely unrelated negligence suit arising from a car crash in Michigan. Under Davis's theory, these matters would constitute a single transaction for statute-of-limitations purposes, no matter how different each case might be, simply because the firm agreed to both representations in one engagement letter.

12

A third court has looked for overlap in the subject matter of the two cases. *See Slavens*, *supra*, 1996 WL 422499, at *5 (factual dispute existed over whether lawyer's representation of client in two matters related to ongoing work in third matter).

### ii. Application

After reviewing these cases and others, I find that the case most relevant to this case is *Accelerated Systems*.

The court there dealt with malpractice claims arising from a lawyer's representation of Michael Joseph when he left a business called MRK. 2012-Ohio-3803, at ¶3. When Joseph left MRK and turned the business over to his partners, the Kennedys, the parties signed a separation agreement specifying, *inter alia*, the procedures for calculating each partner's year-end bonus. *Id.* at ¶5. The agreement stated that H&T, an accounting firm, would calculate the bonuses due Joseph and the Kennedys. *Id.* at ¶¶5-7.

Joseph had expected to receive a multi-million dollar bonus, but H&T determined he and the Kennedys each owed MRK more than a million dollars. *Id.* at ¶8. Joseph accused H&T of failing to adhere to the accounting procedures specified in the separation agreement, and of conspiring with the Kennedys to deny him his bonus. *Id.* at ¶9. When H&T learned of Joseph's accusations, it apparently sued Joseph for defamation. *Id.* at ¶11.

After the defamation case began, MRK joined the suit as a plaintiff; MRK and H&T then filed an amended complaint against Joseph, alleging he violated the separation agreement. *Id.* at ¶12. Joseph responded with counterclaims against H&T, "all [of which] stemm[ed] from H & T's . . . audit for MRK and determination of the partners' bonus rights." *Id.* at ¶13. Joseph also joined the

13

Kennedys as third-party defendants and brought claims against them "related to the bonus calculation." *Id.*

However, Joseph's attorney in the bonus-calculation litigation – Ritzler – "voluntarily dismissed without prejudice all [his] counterclaims against MRK, the Kennedys, and H&T[.]" *Id.* The case therefore went forward on the accuracy of H&T's bonus calculation, and the court found Joseph had breached the separation agreement and owed the company nearly $900,000. *Id.* at ¶14.

Having failed to disturb the bonus calculation, Joseph retained new counsel and tried to re-file "the claims [against H&T] that had previously been voluntarily dismissed." *Id.* at ¶17. But the trial court determined "those claims were . . . untimely." *Id.*

Joseph then sued Ritzler for malpractice, alleging Ritzler failed to protect his claims against H&T from the statute of limitations, and that Ritzler negligently handled Joseph's suit challenging the calculation of his bonus. *Id.* at ¶16.

Ritzler moved for summary judgment on statute-of-limitations grounds, arguing that his representation of Joseph embodied two separate transactions: one focused on Joseph's claims against MRK and the Kennedys, and another involving Joseph's claims against H&T. *Id.* at ¶45. In response, Joseph argued "the two representations could not be parsed out as Ritzler argues because they both stemmed from Ritzler's representation of Joseph relating to the bonus calculation." *Id.* at ¶46.

The trial court agreed with Ritzler's statute of limitations defense, and the court of appeals upheld the lower court's determination that Ritzler's representation encompassed two separate transactions.

Even though "Ritzler's representation of Joseph with respect to bonus-related claims against MRK/Kennedys and claims against H&T originated as a 'particular transaction,'" the court

14

explained, the representation "did not continue that way." *Id.* at ¶47. Rather, the parties' conduct –

the dismissal of Joseph's claims against H&T, and the retention of new counsel to litigate those

claims – demonstrated the single undertaking had become two unrelated transactions:

> Once Ritzler voluntarily dismissed any claims against H&T in the MRK litigation, his alleged continued representation of [Joseph] with respect to the[ ] claims against H&T became separate from his continued representation of [Joseph] in resolving the bonus dispute against MRK. We find Joseph's hiring of [another attorney] to refile the claims against H&T as further support that any role that Ritzler had with the H&T matter was a separate undertaking from his representing [Joseph] in the MRK litigation. Thus, Ritzler's actions in relation to the MRK litigation cannot be grounds to toll the statute of limitations with respect to his alleged representation on the H&T matter.

*Id.* at ¶47.

As with Ritzler's representation in *Accelerated Systems*, Waite, Schneider's representation

of Davis arguably originated as a single undertaking: representing Davis "in connection with

pursuing all of [his] claims against his sons and CNG." (Doc. 93 at 3).

But – as in *Accelerated Systems* – the representation did not continue on its original and

anticipated course. Rather, after Waite, Schneider sued CNG for declaratory and injunctive relief

(while omitting the claims for money damages) litigation arose outside Hamilton County, due in

significant part to the conduct of other actors (the IRS, Davis's sons, and CNG).

There was, moreover, little to no overlap between the subject matter of the Sarasota and

Close Corporation matters, and the subject matter of the Hamilton County case. And whatever

overlap existed between the subject matter of the Tax Court Litigation and the Hamilton County was

insufficient under *Accelerated Systems* to make the Hamilton County litigation "related to the

proceeding[s] in which the malpractice occurred." *Slavens*, *supra*, 1996 WL 422499, at *5. This is

particularly true where, as a result of the firm's alleged malpractice, Davis hired new counsel to

15

handle the tax controversy. *See Accelerated Sys.*, *supra*, 2012-Ohio-3803, ¶47 (retention of new counsel to litigate claims wrongly dismissed by prior attorney showed transactions were separate).

Davis contends *Accelerated Systems* is inapplicable because here it was Waite, Schneider's malpractice – its failure to pursue money damages in Hamilton County – that resulted in the multiplicity of litigation outside Hamilton County.

Even accepting the factual accuracy of Davis's contention, that would not distinguish the case. As the court of appeals explained in *Accelerated Systems*, the matters became separate when the lawyer "voluntarily dismissed any claims [Joseph had] against H&T in the . . . bonus litigation." *Id.* That dismissal was, moreover, a key component of Joseph's malpractice claim, *see id.* at ¶16, just as Waite, Schneider's failure to seek money damages in Hamilton County is a key component of Davis's malpractice claim.

I also conclude that treating the Hamilton County, Sarasota, Tax Court, and Close Corporation matters as separate transactions is consistent with Judge Marbley's persuasive opinion in *Capital City*, *supra*.

Attorneys in *Capital City* had negotiated and drafted a merger agreement between their client, Capital City, and another company. 975 F. Supp. 2d at 845-46. The merger turned out to be problematic, however, when Capital City discovered inaccuracies, which its attorneys had not spotted, in the acquired company's financial statements. *Id.* at 846. Nonetheless, Capital City kept the attorneys on to work for it on four subsequent transactions. *Id.* at 852-53. According to Capital City, these transactions grew out of the lawyers' mishandling of the merger. *See id.*

When Capital City sued the law firm for committing malpractice in the merger transaction, the firm responded the claim was untimely under the termination rule.

16

Capital City countered that its claim had not accrued until the firm had completed its work on the four outgrowth transactions. *Id.* at 853. It reasoned that, because the four ensuing transactions "all came about in an attempt to 'put out fires' caused by the [original] merger[,] all services rendered by [the firm] in connection with those matters constitute continuing representation in the [merger] [t]ransaction." *Id.*

Judge Marbley rejected this argument – which essentially mirrors Davis's argument here – as lacking a foundation in Ohio law:

> Nor can it be that representation as to a particular transaction includes every subsequent undertaking that would not have taken place but for the fact of the underlying litigation. Past and present circumstances necessarily impact future causes of action. Thus, if "but-for" causation alone were sufficient to tie future instances of representation to a prior transaction, the 'particular transaction' rule would become a rule of general representation for all practical purposes. Ohio law forbids that result.

*Id.*

Following "the more moderate course" that "Ohio law charts," Judge Marbley concluded that the subsequent transactions would relate to the merger transaction only if, in those subsequent transactions, the firm "fix[ed], alter[ed], or renegotiate[d]" the work the attorneys had done in the merger transaction. *Id.* at 854; *see also Antioch Litig. Trust v. McDermott, Will & Emery*, 2013 WL 1338769, *7 (S.D. Ohio) (same).

While the court accepted that the subsequent transactions "arose in part as a result of debts incurred by [Capital City] during the [original] merger, [the firm's] work on the [subsequent transactions] was not concerned with the fixing, altering, or renegotiating the terms of [the merger]." *Id.* at 854. It therefore held the matters were unrelated, and that the firm's work on those matters did not amount to continuing representation *vis-a-vis* the original merger. *Id.*; *see also id.* at 855 ("even

17

if the motive for this transaction . . . was rooted in the fall-out from the [original] merger, Defendant's work related to [this transaction] is not properly considered 'related to'" original merger).

Likewise, even if the Sarasota Litigation, Tax Court Litigation, and Close Corporation Litigation had their roots in Waite, Schneider's malpractice in the Hamilton County case, that would not *ipso facto* make the matters related. Here, like the client in *Capital City*, Davis has not shown that anything in the other cases involved fixing, altering, or renegotiating the terms of the Hamilton County litigation. Put otherwise, once those cases spun off from the Hamilton County case, they were no longer in its orbit.

Finally, I conclude that treating the four matters as separate transactions is more in keeping with the purpose behind Ohio's termination rule than treating the matters as related.

The termination rule exists to prevent "a client with knowledge of the attorney's malpractice [from] unduly perpetuat[ing] the attorney's potential liability and exposure to suit." *Omni-Foods*, *supra*, 38 Ohio St. 3d at 387-88. Yet that is precisely what Davis has done here: despite being on notice for years that Waite, Schneider refused to do what the engagement letter obligated it do, Davis held back on his malpractice claims until the firm sued him for unpaid fees.

Tolling based on continuous representation "is germane where a cognizable event has occurred and the attorney-client relationship continues so that the attorney has an opportunity to correct the error and perhaps avoid a legal malpractice claim." *Ruf v. Belfance*, 2013-Ohio-160, ¶20 (Ohio App.). But here, there was no ongoing attorney-client relationship in the non-Hamilton County matters after Waite, Schneider turned down the requested representations, and it is difficult to see how the firm's work in Hamilton County gave it "an opportunity to correct the error[s]," *id.*, that

18

occurred outside Hamilton County. Accordingly, accepting Davis's argument here would undermine rather than serve the purpose behind the statute of limitations.

For all these reasons, I conclude there is no genuine dispute of material fact that the representation embodied four separate transactions. I now consider when the attorney-client relationship for each transaction ended.

### b. Hamilton County Transaction

One way in which an attorney-client relationship can end is through "conduct which dissolves the essential mutual confidence between attorney and client[.]" *Brown v. Johnstone*, 5 Ohio App. 3d 165, 166 (1982).

Invoking that principle, Waite, Schneider argues the evidence is undisputed that Davis lost all confidence in the firm – and thus that the Hamilton County claim accrued – no later than February 4, 2011.

The firm notes Davis had been displeased with its handling of the Hamilton County Litigation since its inception. Even after Davis underscored his disagreement *via* his amended complaint, the firm ignored him. And by November, 2010, Davis knew that the common pleas court had denied Waite, Schneider's motion for leave to amend the complaint.

According to Waite, Schneider, the breaking point in the attorney-client relationship came in late January and early February, 2011, when Davis instructed his Tax Litigation counsel to "monitor[ ]" Waite, Schneider's performance and "insure the firm adequately represents" him in the Hamilton County litigation. (Doc. 116 at 28).

To be sure, this is evidence that Davis had indeed lost all confidence in Waite, Schneider, and it might help a jury find that the attorney-client relationship terminated in early February, 2011.

19

But Waite, Schneider has failed to show that Davis's retention of another firm to monitor its performance was unequivocally intended to terminate the parties' relationship, such that judgment as a matter of law is appropriate. *Accord Scherer v. Wiles*, 2014 WL 4351454, *4-5 (S.D. Ohio).

"A lack of trust and confidence in counsel may, but will not necessarily always, lead to the termination of the attorney-client relationship; in any event, that lack of trust and confidence does not constitute the termination of the relationship." *R.E. Holland Excavating, Inc. v. Martin, Browne, Hull & Harper, P.L.L.*, 162 Ohio App. 3d 471, 474-75 (2005).

Rather, a loss of confidence tends to precede a more unequivocal act on the client's part that terminates the relationship. *See Ruf*, *supra*, 2013-Ohio-160, at ¶14 (retention of new counsel to handle divorce proceeding, which client admitted former counsel had handled unsatisfactorily, demonstrated lost confidence); *DiSabato v. Thomas M. Tyack & Assoc. Co., L.P.A.*, 1999 WL 715901, *2-*3 (Ohio App.) (letter informing client's former counsel that new counsel had been retained to file suit on client's behalf in same suit, combined with filing of complaint, was conduct that "dissolves the essential mutual confidence between attorney and client").

But here, Waite, Schneider has introduced no evidence of such an unequivocal act on Davis's part – at least not one that occurred before February 20, 2011. Moreover, while Davis engaged new counsel to monitor Waite, Schneider, there is no evidence he intended that this engagement would displace Waite, Schneider as his attorneys of record in Hamilton County.

Summary judgment is therefore unwarranted on this issue, as a reasonable jury could find the relationship extended at least until March, 2011, when Davis acknowledged Waite, Schneider's withdrawal from the representation, and the firm dismissed the Hamilton County case.

### c. Non-Hamilton County Transactions

An attorney-client relationship also ends when counsel refuses to work, or ceases all work, on a particular undertaking. *See Woodrow v. Heintschel*, 194 Ohio App. 3d 391, 402-04 (2011) (lawyer's cessation of all work and notice to client of withdrawal from representation were unambiguous acts terminating attorney-client relationship); *Busacca v. Maguire & Schneider, LLP*, 162 Ohio App. 3d 689, 694 (2005) (lawyer's letter to client terminating representation ended attorney-client relationship).

The Ohio courts also hold that a client can terminate the relationship by hiring new counsel to handle matters formerly handled by the attorney whom he accuses of malpractice. *Ruf*, *supra*, 2013-Ohio-160, at ¶14; *cf. Accelerated Sys.*, *supra*, 2012-Ohio-3803, at ¶47.

Even viewed in the light most favorable to Davis, the evidence is undisputed and conclusive that the parties' relationship with respect to the Sarasota, Tax Court, and Close Corporation transaction ended when, after Waite, Schneider refused to represent him, Davis hired new counsel.

Here, a rational jury could only find that Waite, Schneider refused to represent Davis: 1) in the Sarasota Litigation in October, 2005; 2) in the Tax Court Litigation in May, 2006; and 3) in the Close Corporation Litigation in April, 2010. A jury could also only find that, shortly after Waite, Schneider turned down these representations, Davis hired new counsel, thereby terminating his relationship with the firm *vis-a-vis* the non-Hamilton County matters.

As Davis asserts, there is a factual dispute as to whether Waite, Schneider continued to represent him in Hamilton County. But in light of my conclusion that the non-Hamilton County cases involved separate transactions, the factual dispute is not material to the timeliness of the refusal-to-represent claims.

21

Davis also argues that the firm's billing records show that it continued to represent him after refusing to represent him in the non-Hamilton County cases. Tellingly, Davis fails to cite – and I could not find – one entry in the one hundred and eighteen pages of records reflecting a bill for work in a matter other than the Hamilton County litigation.

Because there is no genuine dispute that Davis's malpractice claims relating to the Sarasota, Tax Court, and Close Corporation litigation accrued before February 20, 2011, Waite, Schneider is entitled to summary judgment on those claims.

### B. Evidence re. the Hamilton County Malpractice Claim

Waite, Schneider argues that, even if the Hamilton County malpractice claim is timely, it fails for lack of evidence. It contends: 1) Davis has no evidence that he incurred damages; 2) even if Davis incurred damages, the damages are incalculable and speculative; and 3) there is no evidence, let alone expert evidence (which Waite, Schneider contends is a *sine qua non* in a legal malpractice case), that Waite, Schneider's malpractice in the Hamilton County Litigation proximately caused Davis's damages.

### 1. Existence of Calculable Damages

"[A] claim for legal malpractice requires proof of the following elements: (1) the attorney owed a duty or obligation to the plaintiff, (2) there was a breach of that duty or obligation and the attorney failed to conform to the standard required by law, and (3) there is a causal connection between the conduct complained of and the resulting damage or loss." *Vahila v. Hall*, 77 Ohio St. 3d 421, 427 (1997).

"A legal-malpractice case is about what the [client] suffered on account of . . . bad lawyering. So the question is, had the defendant-attorney not been negligent, what losses would the [client] have

avoided?" *Crespo v. Harvey*, 2012-Ohio-5312, ¶11 (Ohio App.) (internal citation and quotation marks omitted). To prevail, a plaintiff must prove that what he lost "is a calculable financial loss." *Id.* A plaintiff must prove damages "with certainty, and damages which are merely speculative will not give rise to recovery." *Trombley v. Calamunci, Joelson, Manore, Farah & Silvers, L.L.P.*, 2005-Ohio-2105, ¶33 (Ohio App.).

Davis claims Waite, Schneider's negligence damaged him in two ways.

First, he alleges that, due to Waite, Schneider's failure to seek money damages in the Hamilton County case, he lost two valuable claims relating to his sons' alleged corporate mismanagement: namely, that they had: 1) violated CNG's close-corporation agreement; and 2) engaged in self-dealing by exploiting CNG's investment opportunities for their own gain and engaging in non-arm's-length transactions with the company.

Second, Davis alleges that, because Waite, Schneider neither put money damages at issue nor prepared for trial, the firm thereby greatly weakened his bargaining position in the global settlement negotiations, thus causing him to settle for less than he would have gained otherwise.

In response to the first component – putative loss of claims *vis-a-vis* his sons – Davis, according to Waite, Schneider, pursued those claims as counterclaims in the Close Corporation Litigation. They were, the firm argues, part of the mix at settlement time.

Waite, Schneider also argues there is no evidence quantifying the amount of damages Davis incurred due to either the lost claims or his allegedly weakened bargaining position.

Finally, Waite, Schneider contends that, in light of Davis's global settlement with CNG, the damages he associates with Waite, Schneider's alleged malpractice are purely speculative.

23

### a. Lost Claims

The firm's arguments concerning the lost claims lack merit because there appears to be – at a minimum – a factual dispute as to whether Davis's counterclaim in the Close Corporation Litigation included not just the alleged violation of the CNG corporate agreement but also the self-dealing claim.

Although Davis testified that his counterclaim in that litigation included all his claims for money damages against CNG, he later explained the counterclaim in fact had not included certain claims for money damages. My review of the counterclaim found no claim corresponding to the self-dealing portion of the lost claims.

Accordingly, were a jury to find that Davis did not raise the self-dealing claim in the Close Corporation Litigation, there would be a factual basis for this component of Davis's alleged damages for malpractice in the Hamilton County case. Furthermore, Davis has evidence indicative of the amount of damages, and thus the calculable nature of that amount.

The firm's original demand letter to CNG provides such evidence, at least in part. The letter identified at least three instances of alleged self-dealing (the Cardio Quick investment opportunity, the extension of short-term loans at inflated interest rates, and the McMillan Manor investment opportunity). The letter also stated that Davis's damages from the self-dealing were at least $1,175,000.

The same conclusion holds for Davis's damages related to the lost close-corporation claim.

At the outset, I note Ohio law does not support Waite, Schneider's argument that, simply because Davis dismissed his close corporation claim as part of his settlement with CNG, he may not recover damages associated with the firm's mishandling of that claim. *See Endicott v. Johrendt*, 2000

24

WL 796576, *8 (Ohio App.) ("settlement of the underlying action is not always preclusive of damages in a malpractice case").

Ohio courts allow such claims to go forward when, as is the case here, a client alleges he accepted a less favorable settlement due to his attorney's negligence. *E.g.*, *Monastra v. D'Amore*, 111 Ohio App. 3d 296, 301-02 (1996). That is what Davis asserts here, and he has introduced sufficient evidence to survive summary judgment on this point.

According to his declaration, Davis received no cash from CNG in exchange for releasing the close-corporation claim. Moreover, Waite, Schneider valued that claim at $10 million when it unsuccessfully sought leave of court to raise the claim in the Hamilton County case.

Viewed in the light most favorable to Davis, this evidence permits enough of an inference that Waite, Schneider's failure to raise the close-corporation claim damaged Davis, such that summary judgment is unwarranted as to this issue.[3]

### b. Davis's "Weakened Position"

Davis's damages associated with his "weakened position," however, are purely speculative and incalculable – or, what comes to the same thing, Davis has no evidence that shows his alleged loss from his weakened settlement position might somehow be calculable.

Davis contends that Waite, Schneider's failure to "timely assert claims for money damages . . . and its failure to prepare for trial . . . caused the [Hamilton County] trial not to occur." (Doc. 138 at 35). Consequently, Davis alleges, "the Hamilton County action represented nothing but potential

---

[3] This is so despite Davis's failure to introduce any evidence tending to show the close-corporation claim was viable – let alone that it was likely he would have prevailed on it or reached a better settlement had it been pending in Hamilton County. This omission is more relevant to causation than damages, though the issues are closely related.

financial downside," so that he had "no real choice when the opportunity was presented to dismiss the Hamilton County Action in exchange for CNG dismissing its counterclaims in order to start negotiations toward a global resolution." (*Id.* at 36).

The nub of Davis's damages contention apparently is the difference in value of the settlement (or outcome at trial) he would have obtained if, but for Waite, Schneider's negligence, money damages were at issue in Hamilton County, and the value of the settlement he and CNG reached in 2011. Yet Davis points to no evidence suggesting what the difference in the respective settlement values is. Indeed, Davis himself testified he could not put a dollar figure on this loss. (Doc. 115-1 at 71). If Davis himself could not tell the jury what his loss was, let alone with an acceptable degree of specificity, the jury could not figure it out on its own.

For this reason, summary judgment is warranted on the weakened-position component of Davis's malpractice claims.

### 2. Proximate Cause

"[O]ne of the essential elements of a legal malpractice claim is a causal connection between the conduct complained of and resulting damage or loss." *Nu-Trend Homes, Inc. v. Law Offices of Delibera, Lyons & Bibbo*, 2003-Ohio-1633, ¶42 (Ohio App.).

In many malpractice cases, the causation requirement "dictates that the merits of the malpractice action depend on the merits of the underlying case." *Vahila*, *supra*, 77 Ohio St. 3d at 427-28. Depending on how the client tries to link his losses to his attorney's misconduct in the underlying case, the client may have an easier or harder time proving causation.

Ohio law has two standards for proving causation: the "some-evidence" standard and the "case-within-a-case" standard. *McCarty v. Pedraza*, 17 N.E.3d 71, 77 (Ohio App. 2014).

"The some-evidence standard applies in cases in which a plaintiff's damage or loss has been suffered regardless of the fact that [the client] may be unable to prove that he would have been successful in the underlying matter(s) in question." *Id.* If the malpractice claim does not depend on showing that the client would have prevailed in the underlying action, "the plaintiff need provide only some evidence of the merits of the underlying claim." *Id.*

The client has a higher burden "if the theory of the malpractice case places the merits of the underlying litigation directly in issue." *Id.* at 78. As the Ohio Supreme Court has explained:

> when a plaintiff premises a legal-malpractice claim on the theory that he would have received a better outcome if his attorney had tried the underlying matter to conclusion rather than settled it, the plaintiff must establish that he would have prevailed in the underlying matter and that the outcome would have been better than the outcome provided by the settlement.

*Envtl. Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St. 3d 209, syllabus (2008).

Here, the parties seem to agree that the case-within-a-case causation test applies.

Davis's theory is that, but for Waite, Schneider's failure to raise the claims for money damages and prepare adequately for trial in Hamilton County, he would have gained a more favorable outcome with CNG and his sons than he achieved in the 2011 global settlement. This theory is viable, however, only if: 1) Davis's unraised claims were meritorious, such that he could have prevailed at trial or, with these added cards in his hand, upped the stakes and increased his ultimate settlement pot; and 2) further trial preparation would have strengthened Davis's bargaining position *vis-a-vis* CNG and his sons and helped secure better terms.

Because Davis's malpractice claim puts the merits of the underlying litigation squarely issue, he must show not only that he would have prevailed on his claims for money damages (or that by

raising them he would have been in a stronger settlement position), but also that either outcome would have been more favorable than the settlement he reached with CNG in 2011.

Doing either requires evidence, not just argument. In this case, that evidence must include expert testimony.

### a. Expert Testimony

In most malpractice cases, a plaintiff can establish causation "with or without expert testimony." *Gijbertus D.M. van Sommeren v. Gibson*, 991 N.E.2d 1199, 1206 (Ohio App. 2013).

But "certain factual circumstances, accruing from the complexity of the relationships or involving transactions with multiple clients or attorneys, may make [expert] testimony necessary." *Id.* at 1208. In these cases, expert testimony is essential "to keep the jury from speculating on how the client's loss or injury is *directly linked* to that which he claims was the breach of duty by the attorney." *Id.* (emphasis in original).

Waite, Schneider contends that this is such a case, triggering Davis's obligation to introduce expert testimony. Davis responds that Ohio law does not generally require expert testimony to prove causation, but that, even if he needs such evidence, the declaration of attorney D. Jeffrey Ireland satisfies his burden.

Contrary to Davis's argument, I find that the factual circumstances underlying his malpractice claim are sufficiently complex that expert testimony is essential "to keep the jury from speculating on how the client's loss or injury is *directly linked* to that which he claims was the breach of duty by the attorney." *Id.* (emphasis in original).

Davis's claim as to the lost value of the overall settlement is no run-of-the-mill malpractice claim. Rather, it is about how sophisticated individuals and business entities – Jared and David

Davis, CNG, their lawyers – would have responded had Waite, Schneider sought money damages in the Hamilton County case.

The record shows that that litigation, which included Davis's claims for injunctive and declaratory relief, and CNG and his sons' counterclaims for millions of dollars in damages, already involved, even absent a demand for money damages on Davis's behalf, "complex legal and accounting issues." (Doc. 138-8 at 19). That was the opinion of Davis's expert, Mr. Ireland.

Moreover, as already noted, the gist of Davis's malpractice claim is not merely that Davis would have proved his self-dealing and close-corporation claims. Rather, the gist is that, with those claims and their putative merits and amounts on the negotiating table, Davis's bargaining position would have been so enhanced that he would have achieved a better settlement with his sons and CNG.

But to assess that claim – and to link the alleged damages to Waite, Schneider's alleged malpractice – a jury would need to consider, at as minimum, whether those claims were viable. Likewise, the jury would need to hear how – and why – the presence of the money-damages claims would have made CNG and Jared and David Davis – all sophisticated, litigious business actors – willing to give Davis better terms in any settlement the parties might have reached. The jury may also need to consider why the leverage Davis already had in the Hamilton County litigation – an injunction indefinitely locking up CNG's dividends – could not secure an equally favorable settlement.

Adding to the complexity, moreover, is the posture of Davis's close-corporation claims and his self-dealing claims (which I assume for this part of my decision that Davis's lawyers in the Close Corporation Litigation did not raise).

29

The record shows that Davis's attorneys in the Close Corporation Litigation sued his sons for breaching CNG's close-corporation agreement. It also shows that these attorneys raised some breach-of-fiduciary-duties claims against Jared and David, but not the self-dealing claim at issue now.

If that is the case, the question becomes why Davis, having sought money damages from his sons in the Close Corporation Litigation, was unable to secure a better settlement with that claim on the table. Likewise, as Davis's lawyers in the Close Corporation forwent the opportunity to sue his sons for self-dealing, the question arises why Waite, Schneider's failure to raise the claim caused the injury, rather than the same failure on the part of the Close Corporation attorneys.[4] *See Gijbertus*, *supra*, 991 N.E.2d at 1206.

This case has the "accrual of factual circumstances" necessitating expert testimony: multiple attorneys handling complex litigation involving multiple issues in multiple forums.[5] *Id.* at 1208. The jury would not have to connect a simple causal chain: instead, it would have to untangle something like a Gordian Knot. That being so, expert testimony – if such an evidentiary weapon could even be forged – has to be on hand to help the jury hack its way to a verdict.

Davis has offered nothing of that essential sort. The Ireland opinion does not meet this need, as it fails to address causation. Instead, Ireland discusses, albeit in great detail, the applicable

---

[4] Davis speculates that his attorneys in the Close Corporation Litigation did not raise the self-dealing claim because the four-year limitations period for claims for breaches of fiduciary duty had expired. Davis points to no evidence to support his statute-of-limitations contention, and it appears inconsistent with the course of the Close Corporation Litigation, in which Davis's attorneys raised other breach-of-fiduciary claims against Davis's sons.

[5] It would also seem likely that multiple disputes of fact likewise would have been a feature as well.

standard of care, and how Waite, Schneider's conduct in the Hamilton County case breached its professional duty to Davis. But Ireland does not try to construct a causal link – let alone give the jury what it needs to deal with a potentially massive tangle of facts and issues – to reach a sensible and fair verdict.

Consequently, Waite, Schneider is also entitled to summary judgment on Davis's claim for damages resulting from the firm's failure to seek money damages in the Hamilton County case.

### b. Lay Evidence

Even assuming that Davis could prove causation without an expert, he has offered no evidence that any part of the firm's alleged malpractice proximately caused either the loss of his close-corporation and self-dealing claims, or so weakened his bargaining position that his request to settle netted him less than if Waite, Schneider had raised and won his proposed claims for money damages.

First, Davis has introduced no evidence that his close-corporation and self-dealing claims were viable, let alone that he was likely to prevail on those claims. *See Envtl. Network*, *supra*, 119 Ohio St. 3d at 213 (client's burden of proof in case-within-case situation "is the same burden the plaintiff would have had to satisfy if the underlying case had gone to trial").

Second, there is no evidence that Davis would have been in a better position had Waite, Schneider timely pursued the money-damages claims and prepared more thoroughly for trial. Once again, the record contains no evidence as to how the supposedly better position would have resulted, in sufficiently concrete terms, in a better outcome for Davis.

Finally, there is no evidence as to how the value of the more favorable settlement Davis hoped to procure would exceed the value of the settlement he actually reached with CNG. Not only

does this expose a hole in Davis's causation theory, but it also underscores why expert testimony was necessary.

## Conclusion

In sum: 1) Davis's malpractice claims relating to the refusals to represent him in the Sarasota, Tax Court, and Close Corporation Litigation are untimely; 2) his claim based on the fee agreement and Waite, Schneider's disclosure of proprietary information is untimely; and 3) the Hamilton County malpractice claim fails for want of: a) proof of a calculable loss re. his "weakened position"; b) expert evidence of a causal link between the malpractice and any non-speculative loss; and c) lay evidence showing Davis's "lost claims" were viable or that he would have obtained a better settlement had those claims been on the table in Hamilton County.

It is, therefore,

ORDERED THAT Waite, Schneider's motion for summary judgment on Davis's counterclaim (Doc. 116) be, and the same hereby is granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge[*]

---

[*] Of the United States District Court for the Northern District of Ohio, sitting by designation.

32