**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Waite, Schneider, Bayless                                    Case No. 1:11CV851
       & Chesley Co., L.P.A.,

          Plaintiff

       v.                                                    **ORDER**

Allen Davis,

          Defendant

This is a suit by a law firm to collect unpaid fees from a former client.

Plaintiff Waite, Schneider, Bayless & Chesley Co., L.P.A. represented defendant Allen Davis for more than six years in connection with certain of Davis's claims against CNG Financial Corporation, a closely held company that Davis's two sons controlled.

In March, 2011, Davis instructed Waite, Schneider to dismiss the lawsuit it had filed against CNG. Six months later, Davis, with the assistance of new counsel, entered a settlement agreement with CNG that, by and large, resolved his disputes with the company. Soon thereafter, Waite, Schneider tried to collect its fee, but Davis refused to pay. The firm then brought this suit for breach of contract and quantum meruit.

Pending is Davis's motion for summary judgment. (Doc. 118).

Because Davis's motion depends on a highly disputed version of the facts, and because fewer cases are less appropriate for summary judgment than this one, I deny the motion.

## Background[1]

This case has its origins in the many disputes, both personal and business-related, that erupted between Davis and his sons Jared and David.

In the early 1990s, Jared and David founded CNG, a payday-lending company. Jared and David were the majority shareholders, controlled the board of directors, and held the top officer positions. Davis, a successful and sophisticated banker, accountant, and corporate officer, held a minority interest in the company and gave CNG financial assistance. By all accounts, CNG was extremely profitable.

### A. Problems as a Minority Shareholder

In 2002, Davis became estranged from his sons when he divorced his wife and their mother, Judith Davis.

As part of the division of marital property, Judith sought to obtain half of Davis's interest in CNG. But Judith wanted cash, not the shares themselves, which were "illiquid." (Doc. 118 at 11). Davis could not afford to pay Judith the cash value of half his shares, which in total were worth $30 million, and transferring half his shares to Judith would have "intolerably diluted" his interest in the company "relative to his outstanding risk." (*Id.*). At the time, Davis was "personally liable on over $10 million of CNG loans." (*Id.*).

To resolve these issues, Davis, Judith, and their sons executed an Amended and Restated Option Agreement. The agreement allowed Davis to transfer half his shares to Judith, who redeemed

---

[1] This order presumes familiarity with my decision granting summary judgment to Waite, Schneider on Davis's counterclaims for legal malpractice. *Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis*, --- F. Supp. 3d ----, 2015 WL 1327144 (S.D. Ohio).

the shares for a predetermined price. CNG then granted Davis the option to make a "cashless exercise" and receive, without additional consideration, the shares he had transferred to his ex-wife.

Davis and his sons also executed the Close Corporation Agreement, which governed certain aspects of CNG's affairs. It provided, *inter alia*, that Davis and his sons would receive equal compensation from CNG. According to Davis, this agreement "protected [him] from the hostile will of his sons and ensured that they could not loot and destroy the family company." (*Id.* at 12).

When Davis exercised his rights under the Option Agreement in August, 2004, his sons refused to abide by the agreement. CNG transferred to Davis fewer shares than he was entitled to receive, thereby "depriving him of substantial worth and valuable voting rights." (Doc. 134 at 14).

To make matters worse, Davis's sons allegedly "denied him equal compensation and engaged in several self-dealing transactions." (Doc. 118 at 13). The sons also insisted that Davis dissolve a voting trust that allowed him to vote Jared's shares (and thus gave him a greater degree of control over the company than his shares indicated). Finally, the sons embarked on a "reckless" course of borrowing and distributing excessive dividends. (Doc. 134 at 14).

After Davis exercised the option, his sons, acting to further frustrate him, claimed a tax deduction on CNG's behalf for the value of the shares the company transferred to Davis. They claimed the shares represented reasonable compensation for Davis's services to the company, in which case the value of the shares would have been taxable to Davis as income.

Thus, as of late 2004, Davis found himself a minority shareholder in a company controlled by his two antagonistic and estranged sons. Davis therefore tried to dispose of his CNG shares, but his efforts were unsuccessful. Davis's sons had a right-of-first refusal on the sale of his shares, which

they refused to waive. Thereafter, Davis and his sons could not agree on "a structure . . . for the valuation of his shares." (Doc. 134-2 at 28).

### B. Davis Retains Waite, Schneider

In August, 2004, Davis turned to Stanley Chesley, a lawyer at Waite, Schneider, for help resolving his disputes with CNG. Chesley referred Davis to Waite, Schneider associate Jim Cummins, an experienced corporate litigator.

According to Cummins, the purpose of the firm's representation of Davis was:

> to extricate [Davis] from the circumstances that he found his CNG investment to be in. That is he was a minority shareholder in a nonpublic company without any governance ability and any financial control ability, and it was our task to extricate him, develop a strategy to extricate him from that by some financial exit strategy.

(Doc. 123 at 19).

In January, 2005, Cummins drafted a demand letter to CNG's counsel, Mark Ruehlmann. The letter identified a number of disputes Davis had with CNG, including, *inter alia*: 1) the proper tax treatment of Davis's stock option; 2) the sons' alleged violations of the Close Corporation Agreement; and 3) the sons' alleged self-dealing.

However, Cummins and Ruehlmann were unable to reach an agreement, and Waite, Schneider prepared to sue CNG in the Common Pleas Court of Hamilton County, Ohio.

### 1. The Engagement Letter

In the months before the Hamilton County litigation, Davis and Waite, Schneider agreed to a contingency-fee representation. Although Davis "assumed" the representation would be on an hourly basis, he acknowledged that Waite, Schneider attorneys "talked to [him] about a contingency fee arrangement over the course" of a "three-month period." (Doc. 134-2 at 264).

4

The parties executed an engagement letter on February 21, 2005. Davis read the letter before signing it and did not ask any questions about its content. He also agreed that he had received multiple drafts of the fee agreement before signing the final version.

The letter, which included the heading "**Re: Claims relating to CNG Investments**," provided in pertinent part:

> This letter confirms our agreement to represent you in connection with your claims and the potential lawsuit referenced above. As explained in detail below, we have accepted this representation on a contingency basis subject to your obligation to reimburse us for all out-of-pocket expenses.
>
> If this matter is resolved within twelve months from the date of this letter, that is February 21, 2006, we will be entitled to receive legal fees in the amount of twenty-five percent (25%) of the amount recovered on your behalf by way of suit, compromise, settlement, judgment, or otherwise. In the event that this matter is not resolved in such period, we will be entitled to receive legal fees in the amount of one-third (33 1/3%) of the amount recovered on your behalf.
>
> The amount recovered for you would include tax savings on the treatment of your option exercise, the payment of additional dividends and guarantee fees to you and the value of additional shares of CNG issued to you as well as a fair value attributed to any injunctive relief we obtain on your behalf. . . .
>
> *   *   *
>
> We are reserving our right to withdraw from this case and terminate our services if the facts turn out to be other than we have understood them from you, if you fail to assist us as we may request in the course of this litigation, or if you fail to keep current on our billing for costs and expenses. . . .
>
> You have the right to terminate our services at any time. If our services are terminated by you or us, then we shall be entitled to the reasonable value of our services upon the successful resolution of the matter or completion of any litigation.

(Doc. 118-6 at 1-2).

Although the first paragraph of the engagement letter referred to a "potential lawsuit," the letter made no further reference to any lawsuit. However, on February 18, 2005 – three days before

the parties executed the engagement letter – Cummins had emailed Davis to explain that he would shortly provide Davis with a final copy of the firm's proposed complaint against CNG. At his deposition, Davis agreed that he had "edited portions of the complaint before it was filed." (Doc. 115-1 at 274).

On February 22 – a day after the parties signed the engagement letter – Cummins wrote Davis a letter with the heading "**Re: Authorization to commence litigation - CNG**." (Doc. 134-2 at 73). Cummins stated:

> We have prepared a complaint for declaratory and injunctive relief to be filed on your behalf against CNG. As you know, we have spent months trying to resolve these issues peacefully, no resolution has occurred and you have asked us to seek a resolution on your behalf through the court system.
>
> We have explained the possible litigation and arbitration strategies, along with the risks that accompany litigation and arbitration. While no attorney can assure his or her client of the outcome of litigation, we can assure you that we will do our best to achieve a successful result.
>
> We confirm here the instruction that you have issued to our firm to proceed with the filing in the Hamilton County Court of Common Pleas of a complaint against CNG for declaratory judgment along with a request for equitable and injunctive relief.

(*Id.*).

### 2. Supplement to the Fee Agreement

As Cummins had explained, one goal of Waite, Schneider's representation of Davis was to extricate him from his position as a CNG minority shareholder. To this end, Waite, Schneider obtained Davis's consent "to generate . . . settlement proposals in which [Davis's] shares would be purchased[.]" (Doc. 123 at 24).

In August, 2005, Davis expressed doubts to Chesley as to whether CNG would have sufficient funds "to pay [Davis's] claims and purchase [his] stock for cash," given Jared and David's mismanagement of CNG's affairs. (Doc. 115-1 at 284). Davis therefore requested Waite, Schneider to modify the fee agreement to reflect that, should Davis obtain a stream of payments over time from CNG, Waite, Schneider would accept its fee in a similar form. Chesley agreed to this proposal.

Accordingly, the parties supplemented their fee agreement in late August, 2005. The supplement stated that Davis had "authorized [Waite, Schneider] to make offers of settlement for a complete settlement of [his] claims, including a sale of your CNG stock (the 'Recovered Amounts')." (Doc. 118-11 at 1). It further provided that the firm would accept a stream of payments over time, and that it would not charge a fee on the first $10 million it recovered for Davis.

### C. Hamilton County Litigation

In February, 2005, Waite, Schneider filed suit on Davis's behalf against CNG in the Hamilton County Court of Common Pleas. The complaint sought a determination of Davis's rights under the Option Agreement, a declaration of the number of shares to which he was entitled, and a finding that the shares he obtained via the Option Agreement were not compensation.

### 1. Successes

Although the details of the representation do not matter greatly for purposes of Davis's motion, the evidence, viewed in the light most favorable to Waite, Schneider, tends to show the firm did yeomen's work in the Hamilton County litigation.

While expending some 8,000 hours of attorney time over six years, the firm: 1) won a temporary restraining order – and later a preliminary injunction – forbidding CNG to distribute dividends, borrow on credit, or hold shareholders meetings; 2) obtained the right for Davis to

inspect, in person, the company's books and records[2]; and 3) defended many of its victories in the common pleas court in the Ohio Court of Appeals, the Ohio Supreme Court, and the United States Supreme Court.

With the dividend injunction in place, moreover, and CNG now subject to more stringent financial controls, the company's capital remained inside the firm, and Davis's sons were not able, as they had been previously, to use the company as their own "piggy bank." CNG's financial prospects improved significantly.

The firm also generated three offers to purchase Davis's shares between October, 2005, and June, 2006. Although each offer exceeded, by tens of millions of dollars, the value Davis had assigned to his shares, Davis rejected the offers as too low.

Waite, Schneider also engaged in multiple rounds of settlement negotiations with CNG. The first round occurred during May through July, 2005. Thereafter, in early 2009, the parties tried to mediate their dispute. From mid-August to mid-December, 2009, attorneys from Waite, Schneider advised Davis during discussions with his sons and CNG regarding a global settlement of all litigation that had arisen with CNG. *See Waite, Schneider*, --- F. Supp. 3d at ----, 2015 WL 1327144, *1-2. Additional settlement negotiation took place between June and September, 2010.

### 2. Failures

At the same time, Davis had many complaints about Waite, Schneider's representation.

Chief among them was that the firm had refused to pursue Davis's claims for money damages against CNG. Davis wanted the firm to allege that his sons had: 1) violated the Close Corporation

---

[2] The company had previously threatened to refuse to allow Davis entry to CNG's offices. Davis believed the right to inspect CNG's books would help resolve his disputes with the company, given his sons' earlier refusal to agree on a way to value Davis's shares.

Agreement by failing to ensure Davis received equal compensation; and 2) engaged in self-dealing by exploiting several CNG investment opportunities for their own benefit.

Despite a steady stream of complaints from Davis, Waite, Schneider did not move to amend the complaint until 2009. The common pleas court denied the motion, thereby foreclosing Davis from recovering money damages in Hamilton County.

Davis also developed "big picture" problems with Waite, Schneider's strategy in Hamilton County. Although the dividend injunction had proved valuable (even Davis acknowledged his sons became "way stressed" and "financially stressed" once the injunction was in place (Doc. 123 at 172)), it also denied Davis access to millions of dollars in dividend distributions.

Davis was likewise angered by what he perceived to be Waite, Schneider's failure to prepare for trial, and the firm's apparent inability to negotiate a final settlement. *Waite, Schneider*, *supra*, --- F. Supp. 3d at ----, 2015 WL 1321744, at *2

Davis's dissatisfaction with Waite, Schneider was not, moreover, limited to the Hamilton County litigation.

After that case began, Davis became entangled in litigation with CNG in three separate forums. *Id.*, at *2-3. Relying on his understanding of the engagement letter with Waite, Schneider, Davis asked the firm to represent him in each case. But the firm refused to do so, thereby forcing Davis to retain new lawyers to represent him on an hourly basis.

### 3. Dismissal

With the Hamilton County case moving toward an April, 2011, trial date, another CNG minority shareholder approached Davis to discuss a global resolution of his disputes with CNG.

Being amendable to this proposal, Davis instructed the attorneys representing him in his tax dispute with CNG to pursue the settlement.

But there was a catch: CNG would not negotiate unless Davis first dissolved the dividend injunction in Hamilton County.

On March 17, 2011, Davis had a phone conference with Chesley and Cummins about CNG's proposal. When Davis suggested dissolving the injunction, Cummins and Chesley protested strongly. According to Davis, Chesley threatened that Waite, Schneider would withdraw if he insisted on dissolving the injunction.

Chesley, however, had no recollection of making such a threat, and Cummins testified that Davis had "mischaracteriz[ed]" what happened. (Doc. 123 at 266). In Cummins's telling, Chesley merely told Davis that dissolving the injunction would "substantially weaken the case and your leverage" and imperil the success – indeed, the viability – of the Hamilton County litigation. (*Id.*).

Because Davis was concerned the firm would not follow his instructions, he emailed Cummins and Chesley on the night of March 17 to reiterate the firm dissolve the injunction. But Davis's email also suggested he wanted the Hamilton County case dismissed in its entirety:

> [My wife] and I have decided today that we do not want to continue an injunction to prohibit dividends that is adverse to our interests especially in light of the fact that CNG operations have dramatically improved.
>
> Consistent with your statements that you would no [*sic*] proceed in the CNG [*sic*] without a dividend injunction we understand you will dismiss the case. CNG has indicated that when you dismiss they will dismiss their their [*sic*] claims as well. Attached is a proposed stipulation.

(Doc. 118-41 at 1).

Neither Chesley nor Cummins saw the email on March 17, though Cummins saw it sometime on the morning of March 18.

On March 18, attorneys from Waite, Schneider were due to appear at a pretrial conference in the Hamilton County case. Before the conference, Cummins met with attorney Benjamin Dusing, who was representing Davis in his tax dispute with CNG and is Davis's attorney of record in the present litigation. Dusing told Cummins he was there, on Davis's instructions, to ensure Waite, Schneider not only dissolved the injunction, but also dismissed the case.

Because Cummins was unsure of Dusing's authority, Dusing called Davis on his cell phone, and Dusing, Davis, Cummins, and Chesley discussed whether Davis wanted to dismiss the suit. After Chesley reiterated his frustration at Davis's desire to dissolve the injunction, Cummins determined Davis had made a knowing decision to dismiss the case. Immediately thereafter, Chesley filed a stipulated entry of dismissal.

### D. Redemption Agreement

With the Hamilton County case dismissed, Davis, with the assistance of Dusing, resumed negotiations with CNG. Davis contends Waite, Schneider had no role in these negotiations, though the record shows some communications between him and the firm about the progress of settlement talks. Waite, Schneider attorneys also represented they were ready, willing, and able to assist Davis in any way they could.

In September, 2011, Davis and CNG executed a Redemption Agreement, whereby Davis agreed to dismiss all his pending lawsuits against CNG, and CNG agreed to purchase his shares.

11

**Analysis**

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

Davis contends he is entitled to summary judgment on the breach-of-contract claim for two reasons.

First, he contends the contingency-fee agreement is unenforceable because: 1) it does not clearly define the scope of the representation, in violation of the Ohio Rules of Professional Conduct; 2) it gives Waite, Schneider a non-contingent right to payment; 3) the fee agreement allows Waite, Schneider to recover the value of a settlement offer Davis rejected; and 4) the fee is excessive.

Second, Davis argues that, even if the fee agreement is enforceable, Waite, Schneider cannot recover a fee because: 1) none of the specified contingencies occurred; and 2) the firm withdrew from the representation before any contingency occurred.

Davis also contends he is entitled to summary judgment on Waite, Schneider's claim for quantum meruit. He argues: 1) no contingency occurred; 2) the firm conferred no benefit on him;

12

and 3) the equities are such that, even if Waite, Schneider conferred some benefit on him, it is equitable that firm not receive a fee.[3]

## A. Whether the Fee Agreement Is Enforceable

Ohio law provides that "an attorney, as an officer of the court and subservient to its canons, cannot call upon the courts to enforce a contract . . . which is overreaching, unconscionable, unreasonable or unfair." *Jacobs v. Holston*, 70 Ohio App. 2d 55, 59 (1980); *see also Vermeeren v. Donnamiller*, 2007 WL 4277880, *4 (Ohio App.) ("a court of law should not lend its support to the enforcement of a contract which may violate a Supreme Court Disciplinary Rule").

### 1. Scope of the Engagement

Davis first contends the fee agreement is unenforceable because it does not clearly define the scope of the representation.

The Ohio Rules of Professional Conduct provide that "[t]he nature and scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible

---

[3] Waite, Schneider asserts I should summarily deny Davis's motion because he failed to support it with the required expert evidence. I note that Davis has now supplied an expert report, though in submitting it as an exhibit to his reply he violated Local Rule 7.2(d). Because Davis's motion fails on the merits, I will not rely on that violation to deny the motion. I caution Davis, however, that, contrary to assertions in his brief, he must present expert testimony if he wishes to prevail at trial on his contention that the fee agreement is unethical and unenforceable. *Northwestern Life Ins. Co. v. Rogers*, 61 Ohio App. 3d 506, 512 (1989) ("Expert testimony is required so that the trier of fact does not have to speculate on the standard of care, particularly in a complex case."); *Fincher v. Phillips*, 2011 WL 766554, *2 (Ohio App.) (expert testimony needed to prove fee was excessive); *Drain v. DeFabio*, 1994 WL 386013, *3 (Ohio App.) (expert testimony required to prove that attorney's failure to file timely complaint was malpractice).

shall be communicated to the client, preferably in *writing*, before or within a *reasonable* time after commencing the representation." Ohio R. Prof'l Conduct 1.5(b) (emphasis in original).[4]

"The detail and specificity of the communication required by division (b) will depend on the nature of the client-lawyer relationship, the work to be performed, and the basis of the rate or fee." *Id.*, comment 2.

A major dispute between the parties is whether Waite, Schneider agreed to represent Davis not only in connection with the claims he pursued in Hamilton County, but also in the three lawsuits that arose between Davis and CNG after the Hamilton County litigation began. *Waite, Schneider*, *supra*, --- F. Supp. 3d at ----, 2015 WL 1321744, at *2-3.

Davis contends the engagement letter created, in essence, a "perpetual" obligation on Waite, Schneider's part to represent him "whenever a claim was filed by any party relating to [his] CNG investment." (Doc. 115-1 at 277). In the alternative, Davis argues that even if the representation were limited to the Hamilton County litigation, the engagement letter did not apprise him of that limit.

Waite, Schneider disagrees, contending it discussed representing Davis *vis-a-vis* his minority shareholder position over a three-month period before the parties executed the engagement letter. The firm also observes that it provided Davis with a draft copy of its complaint in the Hamilton County litigation, and that Davis himself edited the complaint before the firm filed it. In these circumstances, Waite, Schneider contends, it clearly communicated the scope of its representation to Davis before the Hamilton County litigation began.

---

[4] These Rules took effect in 2007, after the parties executed the engagement letter. For the most part, the Rules are consistent with the Ohio Code of Professional Responsibility and the accompanying Ethical Considerations, which were in effect in 2005. One notable exception is that the current Rules require that contingency-fee agreements be in writing, whereas the prior Code only encouraged the use of a writing.

Viewed in the light most favorable to Waite, Schneider, the evidence would permit a reasonable jury to find the firm clearly communicated its representation was limited to resolving Davis's minority shareholder problems via the Hamilton County litigation.

First, the three months of pre-engagement discussions between the firm and Davis focused on Davis's minority shareholder problems. Although Cummins had identified additional claims Davis could have pursued against CNG in forums outside Hamilton County, there is no evidence that the parties agreed Waite, Schneider would be responsible for litigating those claims in whatever forum they arose.

Second, Cummins testified he and Davis discussed resolving Davis's problems through a sale of his shares, and using litigation to increase CNG's value while also increasing the pressure to settle.

Third, Waite, Schneider had given Davis a draft copy of the Hamilton County complaint, and Davis testified he had edited that document.

Taken together, this evidence tends to show the parties understood Waite, Schneider's representation was limited to pursuing certain claims against CNG in Hamilton County with an eye toward extricating Davis from his minority position. In contrast, there is no evidence Davis told the Waite, Schneider attorneys he wanted or expected them to represent him in any and all future litigation with CNG. The absence of such evidence is unsurprising, given that the other matters arose after the Hamilton County litigation began. *Waite, Schneider*, --- F. Supp. 3d at ----, 2015 WL 1321744, at *2-3.

15

Accordingly, Davis is not entitled to summary judgment on the ground that Waite, Schneider failed to apprise Davis of the limited scope of the representation.[5]

## 2. Non-Contingent Right to Payment

Contingency-fee agreements entail a "shared risk of non-recovery" between the client and the lawyer. *Cincinnati Bar Ass'n v. Schultz*, 71 Ohio St. 3d 383, 384 (1994). If the contingency does not occur, the lawyer cannot recover a fee.

For that reason, courts have emphasized that contingency-fee contracts purporting to give a lawyer a non-contingent right to payment when a matter concludes unsuccessfully are problematic. *Cuyahoga Cnty. Bar Ass'n v. Levey*, 88 Ohio St. 3d 146, 148 (2000) (disciplining attorney whose "contingent-fee agreement with [clients] provided for an hourly charge if he was discharged *whether or not, a successful completion* [of case] occurred") (emphasis in original); *Columbus Bar Ass'n v. Klos*, 81 Ohio St. 3d 486, 489 (1998) ("The contingent fee portion of the contract . . . was also flawed" because it "provided that should the attorneys be discharged or withdraw prior to settlement, they would be compensated" at hourly rate).

Although the parties here executed a contingency-fee contract, Davis contends one provision in the contract gives Waite, Schneider this kind of non-contingent right to payment. He relies on the provision stating that, if either party terminates the representation, Waite, Schneider "shall be entitled

---

[5] It is worth mentioning that Davis cites no authority invalidating a fee agreement on the ground it did not clearly set forth the scope of the representation. *Cf. Gullotta v. McKinzie*, 2014-Ohio-5729, ¶22 (alleged violation of Rule 1.5 "does not necessarily render the agreement unenforceable"). Of course, one could imagine a court invalidating an ambiguous fee agreement where a lawyer tried to collect on work that the engagement letter did not clearly encompass. But that is not the case here, as no one disputes the fee agreement encompassed the work Waite, Schneider performed in Hamilton County.

to the reasonable value of [its] services upon the successful resolution of the matter or completion of any litigation." (Doc. 118-6).

Waite, Schneider responds that the adjective "successful" modifies both "resolution of the matter" and "completion of any litigation," such that its right to payment is contingent on success.

Davis's argument lacks merit for two reasons.

First, regardless of whether the fee agreement gives Waite, Schneider a non-contingent right to payment, Waite, Schneider is not trying to enforce that provision of the contract.

Rather, Waite, Schneider's collection action depends on proving two contingencies occurred: 1) Davis, while still represented by Waite, Schneider, resolved his claims against CNG by selling his shares, *see* pp. 25-27, *infra*; and 2) the firm obtained an injunction for Davis that generated three offers to purchase his shares, which, according to Waite, Schneider, represent the "fair value attribut[able] to any injunctive relief" it obtained, *see* pp. 19-21, *infra*.

In these circumstances, whether the parties' fee agreement also entitles Waite, Schneider to a non-contingent right to payment is immaterial. The cases on which Davis relies, moreover – all disciplinary matters that appear of questionable relevance here[6] – are distinguishable, as each involved an attorney who did not fulfill any contingency, but nevertheless tried to recover a liquidated hourly fee.

---

[6] The Preamble to the current Rules of Professional Conduct states that a "violation of a rule does not necessarily warrant any other nondisciplinary remedy . . . The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule."

Second, the language on which Davis relies is, at best, ambiguous, as it could be read to provide that only a "successful" resolution of the matter or a "successful" end to litigation would entitle Waite, Schneider to a fee. Such a construction would make the contract consistent with the ethical obligations Ohio imposes on members of its Bar. And given Davis's inability to recall any of the discussions he had with Waite, Schneider about the fee arrangement, there is no evidence suggesting the parties intended to confer a non-contingent right to payment on Waite, Schneider.

For these reasons, Davis is not entitled to summary judgment on the ground the fee agreement entitles Waite, Schneider to a non-contingent right to payment.

### 3. Right to Payment Based on Rejected Settlement Offers

One basis of Waite, Schneider's collection action is that a contingency occurred when, after the Hamilton County court issued the dividend injunction, Davis received three offers to purchase his shares. According to Waite, Schneider, those offers, which Davis rejected, represent "a fair value attributed to any injunctive relief [it] obtain[ed] on [Davis's] behalf." (Doc. 118-6 at 1).

Davis contends he is entitled to summary judgment on that aspect of Waite, Schneider's claim for ethical and factual reasons.

On the ethical front, Davis argues that allowing a lawyer to collect a contingency fee based on a rejected settlement offer infringes on the client's right to control litigation. Davis also notes this arrangement would result in an unreasonable fee: if the client rejects the settlement offer and recovers nothing, the lawyer's recovery (in this case, one-third of the settlement) would necessarily be unreasonable in relation to the client's non-recovery.

Case law suggests a lawyer operating under a contingency-fee contract cannot recover the value of a settlement offer his client rejects if the lawyer otherwise fails to fulfill a contingency.

18

*Bernard v. Moretti*, 34 Ohio App. 3d 317, 319-20 (1987) (attorney could not recover under contingency contract because "[t]here was no recovery by settlement or otherwise but only an offer which was rejected by the client as was [the client's] right"). Permitting an attorney to recover in those circumstances "would penalize [the client] for exercising his right to reject the settlement." *Culpepper & Carroll, PLLC v. Cole*, 929 So. 2d 1224, 1227 (La. 2006).

But this case is different.

Waite, Schneider is not trying to recover the value of a rejected offer despite the fact it failed to fulfill a contingency. Rather, the firm contends the settlement offers represent "a fair value" attributable to the work it invested in securing the dividend injunction, and thus that it has fulfilled its obligations under the contract. Even Davis concedes, moreover, that obtaining "any injunctive relief" is a contingency entitling Waite, Schneider to a fee is the (Doc. 118 at 40).

For these reasons, the ethical concerns animating the decisions in *Bernard* and *Culpepper & Carroll* do not bar Waite, Schneider from recovering on this basis.

As for the firm's evidence, it is sufficient for a reasonable jury to conclude the settlement offers represent "a fair value attribut[able]" to the injunction.

The firm's opposition catalogues the circumstances leading to Davis's precipitous position as a minority shareholder in a company controlled by his sons, who were hostile to him personally and in business matters. It also notes – and Davis does not dispute – Davis had failed to identify any interested buyer before January 1, 2005. And it notes that, once the Hamilton County court issued a temporary restraining order in May, 2005, Davis received three offers to buy his shares.

Nor is there merit to Davis's argument that "the kind of 'injunctive relief' obviously contemplated by the engagement letter is plainly not the kind of 'injunctive relief' obtained by the

19

dividend injunction." (Doc. 145 at 21). According to Davis, the parties intended Waite, Schneider would collect a fee only if the injunction had "value as an 'end,'" but the dividend injunction it obtained had value "merely as a 'means." (*Id.*).

This argument is inconsistent with fee agreement's broad language, which stipulated Waite, Schneider would be entitled to recover "a fair value attributed to any injunctive relief" it obtained for Davis. (Doc. 118-6 at 1). That the parties also agreed to retain a neutral third party if they could not "jointly determine some fair value measure of the equitable relief obtained" reinforces that conclusion. (*Id.*). Such a provision seems to contemplate the possibility that the injunctive relief would not have a readily identifiable dollar value, much like the dividend injunction Waite, Schneider ultimately obtained.

The "fair value attributed" language admits of compensating Waite, Schneider based on the value that accrued as a result of the dividend injunction. It will be for the jury to decide whether, in fact, the offers accrued as a result of that injunction and, if so, what the fair value of the injunctive relief was.

### 4. Excessive Fee

The Rules of Professional Conduct forbid attorneys to charge an excessive fee. DR 2-106(A). A fee is excessive "when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." DR 2-106(B).

Waite, Schneider seeks to recover a multi-million dollar fee that represents one-third of the value Davis received for shares via the Redemption Agreement. Davis contends that "charging a contingent fee for legal services performed in connection with the sale of a client's asset is, to put it mildly, unusual." (Doc. 141 at 37). He also contends the specific dollar amount Waite, Schneider seeks is excessive.

20

Davis's arguments are meritless.

Unusual or not, a contingency-fee contract connected to the sale of a client's assets is an arrangement both the American Bar Association (ABA) and the Ohio State Bar Association (OSBA) have sanctioned.

In its Formal Opinion 94-389, the ABA concluded that charging a fee based on the value of a transaction disposing of client's assets is appropriate:

> [F]ees on public offerings are often tied to whether the stocks or bonds come to market and the amount generated in the offering. Banks are also hiring lawyers to handle loan transactions in which the fee for the bank's lawyers is dependent in whole or in part on the consummation of the loan.
>
> The use of contingent fees in these areas, for plaintiffs and defendants, impecunious and affluent alike, reflects the desire of the clients to tie a lawyer's compensation to her performance and to give the lawyers incentives to improve returns to the client[.]

ABA Formal Op. 94-389, at 3.

The OSBA's Legal Ethics and Professional Conduct Committee recently issued a similar opinion. It found the rules permit a contingent-fee agreement "where the lawyer represents the client in a transaction and it is agreed that the lawyer's compensation, if any, will come from revenue that the transaction will potentially generate." OSBA Informal Adv. Op. 2013-01 (Jan. 25, 2013), at 1.

In light of these authorities, which Davis does not discuss, there is no basis for invalidating the fee agreement on the ground it unethically depends on a sale of Davis's assets.

Furthermore, Davis's argument that Waite, Schneider's fee is excessive is a highly fact-intensive question ill-suited for resolution on summary judgment.

21

Most importantly, Davis's argument depends on a version of the facts that minimizes the difficulties Davis faced as a CNG minority shareholder, and downplays the steps Waite, Schneider took to alleviate those difficulties.

According to Davis, "there was nothing exceptional about [Davis's] stock" that would justify the multi-million-dollar fee Waite, Schneider is trying to collect. (Doc. 118 at 38). While Davis allows that "CNG was family-owned and closely-held, and subject to certain restrictions," he contends "this is hardly exceptional." (*Id.*).

But framing the issue as a garden-variety stock sale is inconsistent with Rule 56, which requires I construe the evidence in the light most favorable to Waite, Schneider, not Davis. It is also inconsistent with Davis's own (dramatic) account of the difficulties he faced as a CNG minority shareholder whom his estranged sons were relentlessly trying to "squeeze out." (*Compare id. with id.* at 11-13). As a result of his sons' machinations, Davis had little voting power and no control over the company's operations. At the same time, Davis had a good deal of his personal wealth invested in the company – wealth that his sons put at risk by distributing excessive dividends and borrowing heavily.

To be sure, the only formal restriction on Davis's ability to sell his shares was the right-of-first-refusal. But the evidence shows his sons exercised that right to frustrate Davis's attempts to sell his stake: they refused to waive their right-of-refusal and then quarreled with Davis over how to determine the shares' value, all while refusing to allow Davis to inspect the company's books.

Whatever complaints Davis has now about the firm's performance, the evidence viewed in the light most favorable to Waite, Schneider would permit the jury to determine the fee Waite, Schneider seeks is not excessive. After assuming the representation, the firm obtained a temporary

22

restraining order (and later a preliminary injunction) forbidding CNG to borrow or make dividend distributions. Soon thereafter, with CNG now subject to stricter financial controls and its value increasing, Davis received three offers to buy his shares. Waite, Schneider won a number of hard-fought victories for Davis in Hamilton County and defended them on appeal.

In these circumstances, there is no merit to Davis's argument the fee agreement is excessive as a matter of law.

Finally, the Massachusetts Appeals Court's unpublished decision in *Landry v. Haartz*, 988 N.E.2d 876 (Mass. App.) (table), does not support Davis's excessive-fee argument.

The lawyer in that case, Landry, had represented his client, Haartz, for many years on small matters, and always on an hourly-fee basis. *Landry v. Haartz*, No. 04-4760 (Mass. Sup. Ct. Apr. 3, 2009); (Doc. 118-48 at 6-7). But when Haartz sought Landry's assistance in selling her shares in her family's very profitable business, Landry abruptly required Haartz to sign a contingency-fee contract. The contract, which entitled Landry to 1.5% of the value Haartz received for her shares, was highly unusual in corporate litigation. (Doc. 118-48 at 9-10).

The record showed that Landry knew the family was willing to buy Haartz's shares for a fair price, and that he expected the sale would generate tens of millions of dollars. Moreover, Landry did little work to effectuate the sale; he relied almost entirely on the company's lawyers to value Haartz's interest in the company and draft the sales contract. (*Id.* at 8-9, 16).

The Massachusetts Superior Court held that Landry could not enforce the contract because the fee was unreasonable.

Critical to its decision was the court's finding that Landry "was aware, before he proposed the contingent fee arrangement, that the Corporation was willing to repurchase Haartz's interest in

23

the company." (*Id.* at 16). Because there was thus no basis for entering a contingency-fee agreement, the court found that Landry proposed the fee "for his own financial benefit, and in conflict with what he knew were the best interests of his clients." (*Id.*).

The appellate court affirmed, but limited its holding to the facts of the case. *See Landry, supra*, 988 N.E.2d 876, *7 ("The disapproval of the contingent fee arrangement in this instance is a determination of reasonableness in the circumstances."). The court refused to endorse "a categorical prohibition against the use of a contingent fee mechanism in transactions for the sale of corporate shares or other goods, services, or values." *Id.*

The differences between *Landry* and the present case could not be clearer. Here, the sale of Davis's shares was anything but a sure bet, and Waite, Schneider expended substantial time, effort, and resources in trying to arrange a sale. Moreover, there is no history of prior representation between Davis and Waite, Schneider. And given Davis's level of business sophistication and the lengthy negotiations preceding the execution of the fee agreement, there is no basis for finding, as the Massachusetts courts found in *Landry*, that an unscrupulous lawyer took advantage of a client for the lawyer's own financial benefit.

For these reasons, Davis is not entitled to summary judgment on his claim the fee agreement is excessive.

## B. Whether Waite, Schneider<br>Is Entitled to Collect Under the Contract

Davis next contends he is entitled to summary judgment because no reasonable jury could find that Waite, Schneider performed its obligations under the fee agreement. He argues that: 1) none

of the specified contingencies occurred; and 2) Waite, Schneider withdrew from the representation without just cause.

As noted above, Waite, Schneider argues two contingencies occurred that entitle it to payment: 1) Davis sold his shares via the Redemption Agreement while still represented by Waite, Schneider; and 2) the offers to purchase Davis's shares reflect a fair value attributable to the dividend injunction.

### 1. Offers to Purchase Davis's Shares

I have already explained why there is a genuine dispute of material fact as to whether the settlement offers Davis received, but rejected, qualify as "fair value attributed to" the dividend injunction. *See* pp. 19-20, *supra*. Accordingly, there is sufficient evidence on which a jury could find for Waite, Schneider on the ground that it fulfilled this contingency.

### 2. Sale of Davis's Shares Via the Redemption Agreement

Davis also argues the sale of his CNG shares does not entitle Waite, Schneider to a fee because: 1) the contract does not specify such a sale as a contingency; and 2) even if it did, Waite, Schneider withdrew from the representation before that contingency occurred.

These arguments lack merit.

First, the fee agreement states Waite, Schneider was entitled to recover its fee based on "the amount received on [Davis's] behalf by way of suit, compromise, settlement, judgment, or otherwise." (Doc. 118-6 at ).

Second, the supplement to the fee agreement specified that Davis "authorized [Waite, Schneider] to make offers of settlement for a complete settlement of your claims, including a sale

25

of your CNG stock (the 'Recovered Amounts')." (Doc. 118-11 at 1). Third, it is undisputed Davis redeemed his shares via the Redemption Agreement with CNG.

Taken together, the evidence would support a finding that a sale of Davis's shares via the Redemption Agreement satisfied a contingency, and that Waite, Schneider is therefore entitled to a fee.

Contrary to Davis's contention, there is also a genuine dispute over whether Waite, Schneider withdrew before Davis sold his shares.

"If [an] attorney does not see [a] matter to conclusion and voluntarily withdraws without just cause, then a breach has occurred, and this result is the same whether the contract's payment terms were for an hourly wage or a contingent fee." *W. Wagner & G. Wagner Co., L.P.A. v. Block*, 107 Ohio App. 3d 603, 608 (1995). In such a case, the attorney cannot recover unless he had good cause to withdraw. *Id.*

Here, there is enough evidence to permit a reasonable finding either that Waite, Schneider did not withdraw.

In seeking summary judgment on this point, Davis has adopted a one-sided version of highly disputed facts. Indeed, the facts surrounding the phone call that took place between Davis and the Waite, Schneider attorneys on March 17, 2011 – the day before the firm dismissed the Hamilton County case – are almost all in dispute.

For example, while Davis claims that Chesley said he would withdraw the firm if Davis insisted on dissolving the injunction, Chesley has no recollection of making such a statement. Cummins, moreover, testified that Davis had mischaracterized Chesley's remarks, which, though forceful, addressed only the folly of dissolving the injunction.

26

Furthermore, the email Davis sent Chesley and Cummins after that phone conference is ambiguous. It stated that "[c]onsistent with your statements that you would no [*sic*] proceed in the CNG [*sic*] without a dividend injunction we understand you will dismiss the case." (Doc. 118-41 at 1). But it made no reference to Waite, Schneider withdrawing from the representation; rather, it focused on Davis's understanding that the firm would be dismissing the Hamilton County litigation. That is consistent with Chesley's and Cummins's testimony that, if Davis were to withdraw the injunction, his position in the case would untenable.[7]

For these reasons, Davis is not entitled to summary judgment.

### C. Whether Waite, Schneider Can Recover in Quantum Meruit

The doctrine of quantum meruit is "derived from the natural law of equity, the basic concept of which is that no one should be unjustly enriched who benefits from the services of another." *Sonkin & Melena Co., L.P.A. v. Zaransky*, 83 Ohio App. 3d 169, 175 (1992). To prevent such unjust enrichment, "the law implied a promise to pay a reasonable amount for the services rendered and even for materials furnished, in the absence of a specific contract." *Id.*

The elements of quantum meruit are:

(1)[v]aluable services were rendered or materials furnished, (2) for the person sought to be charged, (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services was expecting to be paid by the person sought to be charged.

---

[7] Given my conclusion that a reasonable jury could find Waite, Schneider did not withdraw from the representation, I need not address the firm's alternative arguments that: 1) it had good cause to withdraw; 2) Davis acted in bad faith to prevent Waite, Schneider from performing its obligations under the engagement letter; and 3) Davis's instructions to dismiss the dividend injunction amounted to a constructive discharge of Waite, Schneider. But given the multiple disputes of material facts these issues implicate, they will be fair game at trial.

*Id.*

"[W]here an attorney is discharged by a client with or without just cause . . . the attorney is entitled to recover the reasonable value of services rendered prior to the discharge on the basis of quantum meruit." *Fox & Assoc. Co., L.P.A. v. Purdon*, 44 Ohio St. 3d 69, 72 (1989).

### 1. Right to a Jury Trial

Before attacking the merits of Waite, Schneider's claim, Davis asserts that the "claim for quantum meruit is a question for the Court, not a jury." (Doc. 141 at 46 n.27). Although this argument is ambiguous, it appears – from Davis's citation to an Ohio case for the proposition that "on equitable claims, such as . . . quantum meruit or unjust enrichment, no jury trial is available" – Davis disputes the firm's right to have a jury resolve this claim.

"In Suits at common law, where the value in controversy shall exceed twenty Dollars, the right of trial by jury shall be preserved." U.S. Const., amend. VII. "The right principally allows an individual to demand a jury when a lawsuit will resolve legal, as opposed to equitable, rights." *Exact Software N. Am., Inc. v. DeMoisey*, 718 F.3d 535, 546 (6th Cir. 2013).

In diversity cases like this one, "the right to a jury trial . . . is to be determined as a matter of federal law," not state law. *Simler v. Conner*, 372 U.S. 221, 222 (1963). While "the substantive dimension of the claim asserted finds its source in state law . . . the characterization of that state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law." *Id.* (internal citations omitted).

In *Simler*, the Supreme Court held that a state-law claim to determine "the amount of fees petitioner, a client, is obligated to pay respondent, his lawyer" was "'legal' in character." *Id.* at 223.

Because that suit "was in its basic character a suit to determine and adjudicate the amount of fees owing to a lawyer by a client under contingent fee retainer contract," the Court held it was "a traditionally 'legal' action," for which there was a right to a jury trial. *Id.*; *compare Exact Software*, *supra*, 718 F.3d at 546 (action to enforce attorney's lien for client's unpaid legal fees was equitable action for which no jury-trial right existed).

Under *Simler*, Waite, Schneider has a right to take its claim for quantum meruit to a jury.

### 2. Whether a Contingency Occurred

If an attorney represents a client on a contingency-fee basis, his "cause of action for a fee recovery on the basis of *quantum meruit* arises upon the successful occurrence of the contingency." *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry*, 68 Ohio St. 3d 570, 575 (1994). "Under this approach, in most situations the discharged attorney is not compensated if the client recovers nothing." *Id.*

I have already held that there is a genuine factual dispute as to whether either of two contingencies occurred that would entitle Waite, Schneider to a fee. For the same reasons, summary judgment is inappropriate on this part of the firm's claim for quantum meruit.

### 3. Whether Waite, Schneider Conferred Value on Davis

Davis contends no reasonable jury could find Waite, Schneider conferred any value on him, and thus that Waite, Schneider is not entitled to a fee.

However, this argument suffers from the same flaws as many of Davis's other arguments: it fails to view the evidence in the light most favorable to Waite, Schneider. As I have already explained, Davis found himself in a unique – and untenable position – as a CNG minority shareholder. Waite, Schneider, at his request, expended a great deal of effort and resources to help

29

extricate Davis from that situation. It met, moreover, with many successes: the preliminary injunction, CNG's increased value, the offers to purchase Davis's shares, among others.

This is more than sufficient evidence from which the jury could find Waite, Schneider conferred value on Davis. *See Marty Matusoff & Assoc. v. Kuhlman*, 2000 WL 192449, *3 (Ohio App.) (reversing grant of summary judgment to client because "sufficient evidence was presented showing that [law firm] performed services for [client] and that [firm] was not paid for those services").

### 4. Whether It Is Equitable That Davis Pay No Fee

Finally, Davis contends that, even if Waite, Schneider can recover in quantum meruit, the equities of the case preclude such a recovery.

This argument, too, lacks merit, given the presence of multiple disputes of material fact. To determine whether equity would permit Davis not to pay the fee, a jury will need to decide, *inter alia*: 1) whether Waite, Schneider withdrew from the representation and, if so, whether it had good cause to do so; 2) whether Waite, Schneider attorneys malpracticed the Hamilton County action by failing to raise Davis's claims for money damages; 3) whether Waite, Schneider adhered to their ethical obligations in drafting the fee agreement and explaining the scope of the representation to Davis; and 4) whether Davis acted in bad-faith and tried to avoid paying Waite, Schneider's fee by freezing the firm out of the final settlement discussions.

Because jury questions remain on these issues, and others, summary judgment is unwarranted.

30

**Conclusion**

It is, therefore, ORDERED THAT Davis's motion for summary judgment (Doc. 118) be, and the same hereby is denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge