UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WAITE SCHNEIDER BAYLESS & CHESLEY CO., L.P.A., | : : : | Civil Action No. 1:11-cv-851-JGS-TPK |
| Plaintiff, | : : | Judge Joseph G. Carr |
| Vs. | : : | **MOVANT'S COMBINED** **MEMORANDUM IN OPPOSITION TO** |
| ALLEN L. DAVIS, | : : | **MOTIONS FOR AN ORDER** **WITHDRAWING THE FEBRUARY 5,** |
| Defendant. | : | **2016 SHOW CAUSE ORDER** |

### I.  Introduction

Waite, Schneider, Bayless & Chesley Co., L.P.A. ("WSBC") and its counsel spend the first third of their motion arguing the facts of five different actions to paint a picture that simply is not accurate.  Because the factual premise upon which their motion is based is disputed, for that reason alone, this Court should hold the evidentiary hearing it indicated it would in its Show Cause Order dated February 5, 2016.  So that this Court is not misled, however, Movant will respond to the factual arguments and show factual statements made by WSBC that contradict statements argued in their motion.

Despite requesting an opportunity to file the motions, no one argues that the basis asserted for this Court's jurisdiction is unfounded or the law cited is wrong. Instead, they all argue a number of reasons why this Court may not have jurisdiction. However, jurisdiction to determine whether a fraud on the court has been committed need not be premised on multiple grounds.  The law is clear that this Court does have jurisdiction.  And factual issues in dispute support the Show Cause Hearing this Court indicated it will hold.  WSBC and the attorneys can answer questions about why they failed to disclose the existence of a binding court order from Kentucky that affected the

settlement to the Court and why they chose to flagrantly disregard the order. The parties should have followed the Kentucky order or disclosed the order to this Court before involving the court in the mediation and dismissal of the action.

## II. Factual Background

As this Court reviews these factual disputes, one thing will be clear: Stanley Chesley ("Chesley") and WSBC take whatever position they deem helpful to them before different tribunals in an effort to avoid Movant's judgment against Chesley and to allow him to continue to direct money to himself. When WSBC is receiving money, Chesley postures himself as if he and WSBC are one and the same. However, when Movants attempt to collect money from Chesley through his interest in WSBC, both he and WSBC represent themselves as separate and distinct entities. The evidence will show, however, that in this instance, Chesley and WSBC and its counsel flagrantly misrepresented his relationship with WSBC before this Court.

### A. April 15, 2013 Wind-Up Agreement And The Disregard Of it.

As this Court is aware, on April 15, 2013, and for reasons related to his disbarment in Kentucky and his resignation as an attorney in Ohio, Chesley signed a Wind-Up Agreement. Among other things, he transferred his 225 shares in WSBC to the purported trustee, Thomas Rehme and resigned "from all positions with the corporation, including that of president and an employee." (*See* Wind-Up Agreement, attached hereto as Exhibit A). Despite the clear statements of the Wind-Up Agreement which Chesley signed and which forms the basis for the June 23, 2015 Transfer Order from the Boone Circuit Court in Kentucky (the "Transfer Order"), Chesley has acted in blatant disregard of it. (*See* Transfer Order, attached as Exhibit B).

2

For instance, on January 15, 2014, Chesley signed a corporate resolution as the "sole member of the Board of Directors" of WSBC approving a loan amendment WSBC had with a local bank. (*See* Corporate Resolution, attached hereto as Exhibit C).  How can he be the sole member of the board of directors for WSBC when just eight months earlier, he resigned from "all positions" with WSBC?  The charade continued.

On July 14, 2014, in this case and more than one year from when Chesley allegedly resigned from all positions with WSBC, Chesley provided sworn testimony at his deposition with counsel, Marion Little, at his side and testified to facts which directly contradict the Wind-Up Agreement:

> Q. Ok. And are you presently employed?
>
> A. Yes.
>
> Q. And how so?
>
> A. Waite Schneider Bayless & Chesley, I'm retired, but we still have many matters to resolve, outstanding cases and so forth.
>
> Q. Do you have a –
>
> A. This being one of them?
>
> Q. Understood. Do you have a title or a position?
>
> A. Owner, President, whatever, but I've put somebody in as trustee for the time being.
>
> Mr. Little: Actually let me correct that. You are no longer the President.
>
> A. I'm no longer President. Tom Rehme is, R-E-H-M-E. He's the President.
>
> Q. Do you work there in an attorney capacity?
>
> A. No, I'm just in the midst of doing those things that are necessary relative to outstanding matters, which there's quite a few.
>
> Q. Do you have an economic interest in the firm?

3

A.     Yes for all past work that's been done.

(Doc. 127, Chesley Depo., dated July 10, 2014, at p. 6:3-25).

How could Chesley provide sworn testimony that he is the "owner, president, whatever" of WSBC when he resigned all positions with WSBC? And how could counsel allow that? The slight correction by counsel during the deposition falls far short of what is required.

Additionally, as part of the motion practice in Kentucky that led to the Kentucky Court's September 2015 Order, even Chesley acknowledged in his opposition that after the Wind-Up Agreement, Chesley had signature authority and exercised that authority by signing checks on WSBC's checking account. (*See* Chesley's Opposition Brief, attached hereto as Exhibit D, at 2-3). Chesley's memorandum also acknowledges that at least once, after WSBC transferred its account to another bank, transfers were made "per Stanley Chesley." (*See id*. at 3). And WSBC has never denied in any pleading that after the Wind-Up Agreement, it continued to pay Chesley money. Just recently in the Hamilton County action, WSBC's attorney told the Court that since Movant's judgment, WSBC has paid Chesley monies. When asked by the Court how much, counsel said he did not know.

**B.     June 23, 2015 Transfer Order.**

All of the foregoing is just a sampling of what led up to the Kentucky Court's June 23, 2015 Transfer Order. This Court is well aware of the Transfer Order's requirements. No one disputes that WSBC and Chesley were in possession of the Order when this Court began the trial in this case. The Transfer Order was served on Chesley's counsel and Chesley's counsel later represented to the Kentucky Court that he had complied

4

with its requirement that the Transfer Order be sent to WSBC. And, Movant's counsel in Kentucky also sent the Transfer order to Davis' counsel before the trial began.

### C. The Trial in This Case.

When the trial commenced, both Chesley and counsel stood before the Court representing WSBC. In light of his Wind Up Agreement and prior statements to the Kentucky Court, Chesley's appearance as agent for WSBC was intentionally misleading to the Court and the jury so they would accept that he was an agent of WSBC. As this Court noted in its Show Cause Order, after the jury appeared deadlocked, both counsel and Chesley, on behalf of WSBC, appeared before this Court and discussed settlement. Chesley and counsel negotiated the settlement. When a settlement was reached both Chesley and Mr. Davis were asked by the Court to confirm that they had reached a settlement and that they would submit any disagreement should one arise to the Court. They both confirmed their agreement.

### D. The Dismissal.

On September 24, 2015, after receiving the settlement funds in his trust account, counsel filed a dismissal of this case. All knew that the Transfer Order required WSBC to transfer all revenue due Chesley to Movant's counsel. Yet, nobody followed the Order or disclosed its existence to the Court. Instead, WSBC fell back on its tactic of denying any relationship between it and Chesley. The very same day the dismissal of this case was filed by WSBC, Thomas Rehme, the purported trustee of WSBC and sole signatory to the settlement agreement that Chesley negotiated with counsel, filed an affidavit in Nevada. (*See* Rehme Affidavit, attached hereto as Exhibit E). In complete contradiction of everything presented to this Court as to Chesley's role with WSBC, including Chesley's deposition, Rehme swore under oath in his affidavit the following:

5

> 5. As trustee, I own all of the outstanding shares of WSBC
>
> 9. WSBC is not a party to the Nevada case; it was not a party to the Kentucky action; and it is not a judgment debtor under the Foreign Judgment.
>
> 10. Notwithstanding the fact that WSBC is not a judgment debtor under the Foreign Judgment <u>and WSBC and Chesley are separate and distinct legal entities</u>, plaintiffs filed a writ of garnishment against WSBC's interests in a Nevada trust known as the Castano Directed Distribution Trust (the "Castano Trust").

(*See id.*) (emphasis added).

How can Rheme sign an agreement on behalf of WSBC in this case, after Chesley appeared as WSBC's agent, and turn around and sign an affidavit denying any relationship between them? And how could Chesley testify in this case that he is the "owner, president, whatever" of WSBC, yet have Rehme claim in his affidavit that he owns all of the shares of WSBC? WSBC and counsel offer no explanation.

Inexcusably, WSBC and counsel in their motion offer no explanation why Rehme signed the settlement agreement in this case that Chesley negotiated, yet disavow any connection between Chesley and WSBC — on the same day the dismissal in this matter was filed.

Additionally, in their motion, neither WSBC nor counsel chose to answer a single question posed by this Court in the several hearings that have been held. In the hearing held on January 19, 2016, this Court asked "How Mr. Chesley could appear on behalf of Waite Schneider, an entity as to which on the day in question he had no ownership interest?" (*See* 1/19/16 Transcript ("Tr."), attached hereto as Exhibit F, p. 10:12-15). Neither WSBC nor its counsel, Mr. Little, offer any answer.

WSBC and counsel also failed to answer another of this Court's questions. The Court asked "The second question I have is where did the money go? Who actually got

6

the payment and what did they do with it, he or she do with it?" (*Id*. at p. 11:101-12). Answers to these questions go the very heart of Movant's motion and why this Court should hold an evidentiary hearing concerning the suggestion that fraud has been committed on the Court.

Moreover, the settlement agreement reflects that the money was paid into Mr. Little's IOLTA account. The settlement agreement reflects that Mr. Little held a lien against the recovery and thus would take his fees before the funds were ultimately given to WSBC or Chesley.  So, in negotiating the settlement agreement, Mr. Little made sure that his fees were paid and his lien was honored but, even though he knew of the Transfer Order, he took no steps to ensure the order was complied with.  No one took any step to notify the Court of the Transfer Order that transferred Chesley's interest in WSBC to Movant.

       **E.**    **The Hamilton County Action And The Ohio Supreme Court.**

In their motion, WSBC and counsel argue that at the time of the settlement, WSBC had obtained an order from an Ohio trial court expressly holding that WSBC was not subject to any order issued in Kentucky.  (*See* Motion of Mr. Little at p. 2).  WSBC and counsel failed to inform this Court that, at the time of the settlement and before the dismissal entry was filed, the Ohio Supreme Court on September 17, 2015 issued an order staying the Ohio trial court's order, rendering it unenforceable.  Thus, at the time they took money from Mr. Davis, and before they filed the dismissal, they were aware that the Transfer Order was valid, that WSBC was required to transfer monies to Movant's counsel, and that the lower Ohio court order was unenforceable.  Yet they offer not a single explanation as to why they blatantly disregarded an order from the Kentucky court.

7

Additionally, they also knew that the day after their dismissal was filed and before this Court entered its dismissal on October 9, 2015, the Kentucky court, which always has had jurisdiction over Mr. Chesley, concluded that the Wind-Up Agreement was a sham and ordered Chesley to transfer his ownership interest in WSBC to Movant's counsel.  (*See* 9/25/15 Order, attached hereto as Exhibit G).  Chesley's purported transfer of his shares in WSBC became a nullity as did the purported authority of Thomas Rehme.  Chesley is required to transfer his shares in WSBC and the money received from Davis to Movant's counsel.  Incredibly, no explanation is offered as to why they are relying on a Wind-Up Agreement that has been disregarded as a sham and ignoring a valid order requiring Chesley and WSBC to transfer income to Movant's counsel.  The Transfer Order, based on a great deal of evidence related to the conduct of WSBC and Chesley, invalidated the Wind-Up Agreement upon which they rely so heavily.

Neither WSBC nor its counsel can claim ignorance here.  Indeed, before this Court put on its dismissal entry, counsel, representing WSBC, filed a motion on behalf of WSBC to intervene in the Ohio Supreme Court action.  In their motion, counsel attached four volumes of pleadings and other documents arguing that WSBC's interests should be protected and it should be allowed to intervene in the Ohio Supreme Court. While WSBC and counsel here seek to point out that different counsel represented WSBC in all of these actions, the reality is that Mr. Little filed his motion in the Ohio Supreme Court in a single pleading as co-counsel with Mr. Rafferty who represented WSBC in the Ohio action, and Mr. Mauer who represented Chesley in the Ohio action.

Significantly, in answer to paragraph 58 of the Complaint for Writs for Prohibition and Mandamus filed in the Ohio Supreme, Mr. Little, referring to the

motion in Kentucky which led to the Transfer Order, stated "the motion filed by Ford referred to in the complaint sought the transfer of Chesley's interests in the shares of the Waite firm.  Chesley had no interest in those shares when that motion was filed in Kentucky." (*See* Proposed Answer, attached hereto as Exhibit H, at ¶ 58) (emphasis added). How counsel can reconcile this statement when he sat next to Chesley at the trial and at his deposition when he gave sworn testimony in this case that he was owner, president and "whatever" and had an economic interest in the revenue of WSBC is inexplicable.  The conflicting positions cannot be reconciled.

Moreover, in response to paragraph 59 of the Complaint for Writs for Prohibition and Mandamus filed in the Ohio Supreme Court, Mr. Little stated "the order referred to in the complaint purports to direct that Chesley transfer Chesley's interests in the shares on the Waite firm.  Chesley had no interest in those shares when the motion was filed." (*Id*. at ¶ 59). Again, how can Chesley, WSBC and counsel have it both ways?  They simply cannot.

Factual questions exist which require a hearing.  Indeed, the more factual inquiry one makes, the more troubling the situation becomes.  This Court should hold an evidentiary hearing to determine whether a fraud was perpetrated on this Court when Chesley was offered as the representative of WSBC, in spite of the Wind-Up Agreement WSBC now relies upon, and when no one informed the Court of the Transfer Order despite its clear application to the settlement and when no one followed the Transfer Order.

### III. Law

In addition to the many factual questions that exist, the Show Cause Order should not be dismissed because the law supports the Movant's motion.  All the reasons

9

the parties argue as to why the Court does not have jurisdiction are irrelevant. The question is whether jurisdiction is well grounded upon at least one basis. And in this instance, there is legal support for the Court's jurisdiction.

### A. This Court has Jurisdiction to Determine Whether a Fraud was Perpetrated on this Court.

The parties to this case spend many pages identifying all the grounds on which this Court lacks jurisdiction. Notably, Movant does not, nor has she ever, relied on any of those grounds in support of her jurisdictional argument to bring this claim of fraud on the court. To the contrary, Movant has always alleged that this Court has the inherent jurisdiction to adjudicate a claim of fraud on the court. Incredibly, the Parties' lengthy briefs do not rebut this or cite any authority to the contrary. This silence is telling.

The Sixth Circuit has repeatedly recognized that a court has jurisdiction to investigate whether a fraud was perpetrated on the court, including the jurisdiction to hold an evidentiary hearing. *See Southerland v. Irons*, 628 F.2d 978, 979 (6th Cir. 1980); *see also General Medicine, P.C., v. Horizon/CMS Health Care Corp.*, 475 F. App'x 65, 67 (6th Cir. 2012) (acknowledging that the district court held an evidentiary hearing); *H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118 (6th Cir. 1976) (same).

In *Southerland v. Irons*, 628 F.2d 978 (6th Cir. 1980), the Sixth Circuit rejected appellant's position that a non-party could not raise a claim of fraud on the court. *Id*. at 980. In that case, the district court held oral argument as to the movant's standing and, after concluding standing existed, held an evidentiary hearing on the fraud on the court issue. *Id*. at 979. The Sixth Circuit affirmed both that a non-party could bring a claim

for fraud on the court and also the district court's finding of fraud on the court. *Id.* at 980. Indeed, that Court specifically stated that "a claim of fraud on the court may be raised by a non-party." *Id.* And there is no Sixth Circuit decision requiring that the non-party establish an independent basis for jurisdiction when fraud on the court is asserted. This makes sense—the court already has jurisdiction over the parties before it, and the non-party submits to jurisdiction by filing the motion. And the court is the most knowledgeable court with jurisdiction to decide whether a fraud has been perpetrated upon it. *See Bridgeport Music, Inc. v. Westbound Records*, 714 F.3d 932, 942 n. 10 (6th Cir. 2013) (recognizing that the Sixth Circuit has recognized a court's inherent power to set aside a judgment for fraud).

The United States Supreme Court has recognized that "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose . . . submissions to their lawful mandates." *Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991)(internal quotations and citations omitted). Furthermore, courts have the inherent power to punish contempt, both within and beyond the court's confines. *Id.* at 44. The contempt power arises from "disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Id.*

Importantly, the inherent powers of all courts permit the court to "vacate its own judgment upon proof that a fraud has been perpetrated upon the court." *Id. See also Bridgeport Music, Inc.*, 714 F.3d at 942 n. 10. This power is necessary "to the integrity of the courts, for 'tampering with the administration of justice in [this] manner . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.'" *Chambers*, 501 U.S. at 43 (internal citation

11

omitted). "[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Id.*

And if the court concludes that a fraud has been perpetrated, it has the authority to implement a just remedy. *See Southerland*, 628 F.2d at 979 (reallocating the settlement funds as justice requires); *see also Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425, 428 (6th Cir. 1996) (affirming a fraud on the court finding and the reallocation of the jury award). As such, the parties' attempts to convince this Court that it has no authority to hear the matter or direct the funds to be paid to Movant's counsel in compliance with the Kentucky court's order should be rejected.

The parties cite no case law that changes this conclusion. For example, the parties cite *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), for the specific proposition that once a case has been dismissed pursuant to a settlement agreement, the district court no longer has jurisdiction over the parties involved in the settlement. But *Kokkonen* really stands for the proposition that once an action is dismissed pursuant to a settlement agreement, the federal district court does not, under its inherent supervisory power, have jurisdiction to decide a motion to enforce the agreement. The court in *Kokkonen* reasoned that a breach of the settlement agreement that produced the dismissal is not a basis for federal court jurisdiction, thus the district court would not have jurisdiction over the enforcement action.

But *Kokkonen* does not apply to the instant case because Movant does not seek the enforcement of a settlement agreement. Instead, Movant alleges that fraud was perpetrated on the court, or at least that there are sufficient facts to warrant investigation into the matter. Thus, jurisdiction exists. *See Southerland*, 628 F.2d at

12

980 (setting aside a judgment entered pursuant to a settlement agreement that was induced by fraud).

This Court should reject any argument that this Court has no obligation to enforce the Kentucky court's judgment because it has not been domesticated. The Full Faith and Credit Clause, and the related Act, require state and federal courts to honor the orders and judgments of other courts. The cited authority to the contrary is inapposite, as it discussed only the priority of liens based on the filing date. *See Redondo Const. Co. v. U.S.*, 157 F.3d 1060 (6th Cir. 1998); *Abercrombie & Fitch Stores, Inc. v. Am. Commercial Const., Inc.*, No. 2:08-cv-925, 2010 WL 1055265 (S.D. Ohio, Mar. 18, 2010); *Dressler v. Bowling*, 24 Ohio St.3d 14, 16 (1986). None of these cases stand for the proposition that a court can ignore a foreign court's judgment until it is domesticated.

Accordingly, this Court has jurisdiction to inquire into whether a fraud was perpetrated against this Court and, if it was, to direct payment of the funds to Movant's counsel or, at a minimum, order that the funds be transferred into the Court.

### B. *Younger* Abstention Does Not Apply to the Facts of this Case.

The Parties attempt to evoke principles of comity and abstention in order to convince this Court not to accept jurisdiction over this issue. Specifically, the Parties note the existence of several state court proceedings involving the same parties and assert that the Court should allow the state court cases to move forward without intrusion. But their reliance on *Younger v. Harris*, 401 U.S. 37 (1971), is misplaced.

The cited cases stand for the limited proposition that abstention is mandatory when *Younger* is squarely implicated. "*Younger* abstention counsels federal courts to refrain from interfering with pending state judicial proceedings absent extraordinary

13

circumstances." *O'Neill v. Coughlan*, 490 F. App'x 733, 736-37 (6th Cir. 2012). But the Supreme Court has recognized that *Younger* applies in only three narrow circumstances: (1) intrusion into ongoing state criminal proceedings; (2) certain "civil enforcement proceedings;" and (3) interfering with pending "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Communications, Inc. v. Jacobs*, 124 S. Ct. 584, 591 (2013). When none of these extraordinary circumstances apply, a federal court has a "virtually unflagging" obligation to hear cases over which it has jurisdiction. *See id.*

None of these extraordinary circumstances apply in this case, and so this Court should decide the issue. Importantly, Movant's fraud on the court claim does not ask this Court to interfere with any state proceeding. The issues being litigated in other courts are separate and distinct from the matter before this Court. Specifically, the Court is not being asked to help the Kentucky plaintiffs pursue Chesley, but instead is being asked to determine whether material misrepresentations were made to this Court regarding Chesley's authority to appear and negotiate on behalf of WSBC and whether Chesley and WSBC used this Court to intentionally disobey the Transfer Order.

Moreover, any order from this Court on the issue of fraud on the court or reallocation of the funds does not interfere with any pending state court proceedings. Should this Court find fraud on the court occurred and order payment to the judgment creditors' attorney, such an order would be in furtherance and in compliance with the Transfer Order. And, in light of the Ohio Supreme Court's decision that the Hamilton County court's orders are unenforceable, any such order from this Court would not conflict with any valid, enforceable order. Accordingly, there are no parallel proceedings involving whether fraud was perpetrated on this Court, and the Kentucky order must be

14

enforced, which would require that the funds from the settlement be turned over to Movant's counsel. This Court's decision on these issues would not intrude in any state court proceeding.

No party cites any authority to support the proposition that a United States District Court should be precluded from determining whether fraud had been perpetrated on the court simply because a party to that proceeding is engaged in related litigation elsewhere. Because that is the real reason the Parties ask this Court to abstain, the Court is not bound to do so under *Younger*. This Court should therefore exercise its jurisdiction to decide whether a fraud has been perpetrated.

    **C.    The Facts Learned to Date Support this Court's Show Cause Order and An Evidentiary Hearing Should Be Held.**

The parties engage in substantive briefing as to why none of them committed fraud on this Court. Although each of the Parties discussed the elements of fraud on the court, as noted above, none answer the questions raised by this Court. And none offer any valid reason for failing to inform this Court of either the Wind-Up Agreement or the Transfer Order. Finally, no one explains why the Transfer Order was not followed. Thus, this Court was deceived as to Chesley's authority and unwittingly aided in the disobedience of another court's orders.

"As an officer of the court, every attorney has a duty to be completely honest in conducting the litigation." *Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993) (internal citations and quotations omitted). "While an attorney should represent his client with singular loyalty, that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that

15

standard in the conduct of a case he perpetrates a fraud upon a court." *Id.* (internal citations and quotations omitted). When an attorney withholds information about a settlement from the court, allowing the Court to believe that the settlement was fair and equitable, he breaches his duty to be completely honest in conducting the litigation. *General Medicine, P.C. v. Horizon/CMS Health Care Corp.*, 475 F. App'x 65, 78 (6th Cir. 2012) (Batchelder, C.J., dissenting).

In this case, neither party's counsel informed the Court of the Wind-Up Agreement or the Transfer Order. Although both sides knew of the Transfer Order, as Movant's counsel provided Mr. Davis's counsel with a copy and Chesley represented to the Kentucky court that WSBC was given a copy, it is unknown who knew about the Wind-Up Agreement.

However, the actions of Mr. Little are particularly troubling. It appears likely that he was aware of the Wind-Up Agreement before he offered Chesley as the entity's representative at trial. First, as the advocate for WSBC, he should understand the organization and who had the authority to bind the entity. Second, he corrected Chesley's testimony as to his role at WSBC and that it did not include president. (*See* Doc. 127, Chesley Depo., dated July 10, 2014, at p. 6:3-25). Such a correction would be needed only if Mr. Little was aware of the Wind-Up Agreement and Rehme's position as president. Third, Chesley also testified that he had an economic interest in the litigation before this Court. (*Id.*). Mr. Little did not correct this statement, and thus presumably understood that at least a portion of any recovery would go to Chesley. Yet, Mr. Little never informed the Court of the Wind-Up Agreement or the Transfer Order.

Nor did he take any action in drafting the settlement agreement to address or protect a known lienholder. Instead, he protected only himself. In fact, he required that

16

the settlement funds be transferred into his IOLTA account so that he could be paid immediately. Although Movant does not know where the remaining funds were transferred, given Chesley's testimony during deposition and the fact that other counsel for WSBC has admitted that WSBC has paid Chesley since execution of the Wind-Up agreement, it is likely that Chesley received money from this settlement or will in the future.

Importantly, the misrepresentations at issue in this case were directed to the judicial machinery itself and they were material, as this Court has already recognized. (Doc. 271). The misrepresentations permitted Chesley and WSBC to obtain funds and avoid a court order that required the funds be paid to the judgment creditors. Chesley and WSBC continue to take competing positions in various litigation depending on how they believe the funds can be kept out of the hands of Chesley's judgment creditors. WSBC and Chesley cannot be permitted to manipulate and abuse the judicial system in this way.

Here, because of counsel's failure to inform this Court of two key facts—the Wind-Up Agreement and the Transfer Order—the end result is that this Court was used to obtain funds in a settlement which were then distributed first to Mr. Little and then to unknown parties. But none of these funds were ever given to Movant as required by the Transfer Order.

This Court should reject any argument that Movant should be estopped from pursuing this issue now because she did not intervene in the action before it settled. Chesley disclosed this litigation as a possible source of income, but Chesley never supplemented his response to note receipt of any funds nor complied with the terms of the Transfer Order. However, to protect the judgment creditors' interests, Movant's

17

counsel provided Davis's counsel a copy of the order, believing counsel would adhere to it. And Chesley's counsel represented that WSBC was made aware of the order. Thus, Movant's counsel took affirmative steps to make the attorneys in this litigation aware of the Kentucky order so they could comply. Movant's counsel had no way to know that the attorneys before this Court would completely ignore the order and fail to comply with it. *See Okros v. Angelo Iafrate Constr. Co.*, 298 F. App'x 419, 428 (6th Cir. 2008) ("[O]pposing counsel is instead obliged to operate in conformity with the oath he or she has taken as an officer of the Court. Thus, counsel is entitled to rely on opposing counsel to be forthright . . .").

These facts give rise to an inference of fraud on the court. *See Williamson v. Recovery Ltd.*, No. 2:06-cv-00292, 2014 U.S. Dist. LEXIS 4609, *11 (S.D. Ohio Jan. 14, 2014)(recognizing that "since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court"). In order to protect the integrity of the court, this Court should hold an evidentiary hearing to determine whether fraud was perpetrated on this Court.

## IV. Conclusion

The Parties offer this Court numerous ways in which it does not have jurisdiction to adjudicate Movant's claim of fraud on the court. Yet they fail to address the one basis Movant identifies as this Court's source of jurisdiction: the Court's inherent power to address claims of fraud on the Court. Binding Supreme Court and Sixth Circuit precedent recognize that this Court has jurisdiction over such a claim. And because there is no parallel proceeding that includes the fraud on the court issue pending in state court, this Court is not obligated to abstain from exercising its jurisdiction under *Younger*. Given the facts currently known, this Court can and should hold an

evidentiary hearing regarding the question of whether fraud on the court occurred in this case.  Movant respectfully requests that a hearing occur as soon as practicable.

Respectfully submitted,

/s/ **_Brian S. Sullivan_**
Brian S. Sullivan, Esq. (0040219)
Christen M. Steimle, Esq. (0086592)
DINSMORE & SHOHL, LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Phone:  (513) 977-8200
Fax:      (513) 977-8141
Email:  brian.sullivan@dinsmore.com
            christen.steimle@dinsmore.com

***Attorneys for Movant Mary Lou White-Lynch***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was served upon the registered users of the Court's CM/ECF filing system via this system this 7th day of March, 2016.

/s/**_Brian S. Sullivan_**
