IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Waite, Schneider, Bayless &amp;                    Case No. 1:11CV851
    Chesley Co., L.P.A.,

          Plaintiff

      v.                                          **ORDER**

Allen L. Davis,

          Defendant


Plaintiff law firm, Waite, Schneider, Bayless &amp; Chesley Co., L.P.A. (Waite, Schneider), filed this case as a collection action against a former client, defendant Allen Davis. Davis, in turn, counter-sued, seeking damages for malpractice and related claims.

After extensive pretrial motion practice and one week of a scheduled two-week trial, the parties, at my urging and with my assistance, settled. The parties filed a stipulated notice dismissing all claims with prejudice on September 24, 2015. (Doc. 258). I signed the dismissal order and closed the case on October 9, 2015. (Doc. 260).

### Background

The proceedings leading to this order began when the movant, Mary Lou White-Lynch, moved for disclosure of the settlement agreement.

Ms. White-Lynch represents a group of Stanley M. Chesley's former clients in the "Fen-phen" mass-tort class action in the Boone County, Kentucky, Circuit Court. Chesley and his accomplices, with whom the then-presiding judge was complicit, stole $64 million in settlement proceeds belonging to the plaintiff class. *Abbot v. Chesley*, 413 S.W.3d 589, 598 (Ky. 2013).[1] As part of her efforts to retrieve those funds and restore them to those to whom they belong, Ms. White-Lynch has also asked me to order the parties (*i.e.*, principally Waite, Schneider) to deliver the settlement proceeds to her.

White-Lynch's motion provided information (all unknown by me before trial, settlement, or dismissal) about her efforts to recover, and Chesley's to retain, the funds he and his accomplices[2] stole from their mass-tort victim-clients.

First, in April, 2013, Chesley executed a "Wind-Up Agreement" by which he transferred his shares in Waite, Schneider to attorney Thomas R. Rehme, as Trustee, for the stated purpose of "conduct[ing] an orderly wind-up of the [firm]." (Doc. 280–1 at 1). Chesley also "resign[ed] from all positions with [Waite, Schneider], including that of President and an employee." (*Id.* at 2).

Chesley retained, however, a beneficial interest in the firm's principal asset, namely, the right to receive "legal fees relating to his own efforts or those of other attorneys . . . for services performed prior to" his disbarment. (*Id.* at 3).

---

[1] Chesley's own share of the plundered monies was $7 million. For details about the theft and Chesley's manifold acts of deceit and chicanery that accompanied and followed it, see *Kentucky Bar Ass'n v. Chesley*, 393 S.W.3d 584 (Ky. 2013) (order of disbarment for those acts).

[2] Chesley's co-conspirators, the now-disbarred attorneys Shirley Cunningham Jr. and William Gallion, are serving lengthy prison sentences for their roles in defrauding the *Abbott* class. *U.S. v. Cunningham*, 679 F.3d 355 (6th Cir. 2012). Chesley received immunity from prosecution in exchange for his testimony against Cunningham and Gallion. *Id.* at 384.

Second, on June 23, 2015 – little more than two months before trial in this case – the Boone Circuit Court had, in aid of an earlier $42 million joint-and-several judgment against Chesley and his colleagues, ordered Chesley to turn over to the class his interest in Waite, Schneider. (Doc. 280–2) (the Turn-Over Order). The Turn-Over Order provided, *inter alia*:

- "all distributions pursuant to [Chesley's interest in Waite, Schneider] are to be made to Plaintiffs";

- Chesley was to direct Rehme "to make all payments derived from Chesley's interest in the shares of [Waite, Schneider] payable to the Plaintiffs"; and

- "If for any reason, including . . . any action by another court in any other jurisdiction, monetary payment(s) is/are made to Chesley from his interest in [Waite, Schneider], Chesley and his attorney shall immediately turn over said payment(s) to Plaintiffs' counsel[.]"

(*Id.* at 3).

Third, on September 25, 2015 – before I signed the dismissal order – the Boone Circuit Court entered an order finding that the Wind-Up Agreement was a "sham" and that, notwithstanding Chesley's resignation and lack of ownership interest in the firm, "Chesley continues to control and direct" Waite, Schneider. (Doc. 280–7 at 3) (Sham Finding).

The court elaborated:

Chesley is utilizing [Waite, Schneider] and its existence during what is supposed to be a wind-up period, to prevent Plaintiffs, his judgment creditors, from executing on their Judgment. The Court finds he is taking action to render himself insolvent while directing assets to WSBC, including fees from [litigation], and the transfer of $59 million from his personal accounts to WSBC.

(*Id.* at 4).

3

None of the attorneys who appeared in this case – Marion H. Little, on behalf of Waite, Schneider, and Angela M. Hayden and Kevin L. Murphy, who represented Davis – ever brought any of these matters to my attention.

Nor did White-Lynch or her attorneys at Dinsmore & Shohl give me any notice of her interest in the funds at issue in this case. This unexplained failure is especially troubling, given that White-Lynch: 1) had long been on notice of the pendency of this case; and 2) is involved in collection efforts against Chesley and Waite, Schneider not only in Kentucky, but also in state courts in Ohio and Nevada.

On learning the particulars of the Wind-Up Agreement, the Turn-Over Order, and the Sham Finding, I ordered counsel to show cause why I should not find "that a fraud has been perpetrated on this court." Doing so, I stated:

> Most simply put: had I known but a fraction of what I did not know before dismissal, I would have acted differently. Under no circumstances would I have accepted a settlement that enabled Chesley – or others acting on his behalf or in concert with him – to evade the obligation to pay over the settlement proceeds in accordance with the command of the Boone Circuit Court.

> Asserting that counsel in this case were aware of the Turn-Over order, but failed to inform me of that order and Chesley's continuing noncompliance with it, movant's Status Report of January 31, 2016, contends that "this Court served as a forum for the avoidance of another court's orders." (Doc. 269 at 6).

> That appears so: in a word, at this point, I feel tricked, and complicit, albeit unwittingly so, in chicanery, duplicity, and mendacity.

*Waite, Schneider, Davis & Chesley Co., L.P.A. v. Davis*, --- F. Supp. 3d ----, 2016 WL 447021, *3 (S.D. Ohio 2016).

As should be evident, one impetus for the show cause order was the failure, particularly on Mr. Little's part, to disclose the Wind-Up Agreement. That Agreement divested Chesley, at least on paper, of all authority to manage Waite, Schneider's affairs. But it was Chesley, not Rehme, who appeared on behalf of the firm at trial, and who sat at counsel table as the firm's apparently duly authorized and empowered representative. And it was Chesley, not Rehme, who, in considerable part in my presence, negotiated and initially approved the settlement.

Normally, to be sure, a lawyer does not explain a corporate representative's status and authority: there is no need to do so because that representative is, in fact, duly authorized by the corporation to represent it at trial. There is, under normal circumstances, nothing about the underlying relationship that could give a reasonable person or a reasonable judge pause.

The circumstances of this case are far from normal. Unbeknownst to me, Chesley, having lost the right to practice law in Kentucky (and having resigned his Ohio license so as to avoid reciprocal disbarment proceedings in this state) and facing liability in the Boone Circuit Court on the order of tens of millions of dollars, had renounced all formal connection with the plaintiff.

Under these highly peculiar and unique circumstances, some statement of the basis on which he, with Mr. Little's concurrence, held himself out and acted as a proper representative of the plaintiff firm should have become part of the record of this case.

An attorney dedicated to the duty of absolute forthrightness to a court would, in my view, have informed me about the Wind-Up Agreement. In addition, an attorney so dedicated would have provided, if such existed, proof that Chesley, despite the Wind-Up Agreement's putative terms, had, as he was calling the shots on the firm's behalf, due and lawful authorization to do so. Chesley may well have had such authority, but, under all the circumstances, I should not have been left, in view

5

of the Wind-Up Agreement's divestiture of his interest in and control over the firm, in the dark about that background.

The second impetus to the show cause order was the Boone Circuit Court's Turn-Over Order. This order appears to deprive Chesley of even his beneficial remainder interest in the firm, and to award it to the victims to whom it rightfully belongs.

The third and final impetus was the Boone Circuit Court's Sham Finding, which certainly appears to have a firm foundation in fact and law.

To be sure, the Kentucky court did not enter that order until after the parties dismissed this case (though also before I signed the dismissal, thereby closing the case). But the Sham Finding casts a bright light on the tenacity with which Chesley has sought, and continues unrelentingly to seek, to retain the money that he and his confederates stole from their former client victims.

Pending in response to my order to show cause why I should not find that respondent counsel participated in a fraud on this court are motions by attorneys Little and Murphy to withdraw that order (Docs. 275, 279), and attorney Hayden's opposition on her own behalf and that of her firm to the order. (Doc. 278).

The gravamen of Mr. Little's motion is that I lack jurisdiction to take any action with respect to the *corpus* of the settlement. His motion also contends that no fraud on the court occurred because "there is no suggestion that the Waite Firm's adversary in this litigation" – Davis, the firm's former client – "was prevented from presenting his case fully and fairly." (Doc. 279 at 42) (internal quotation marks omitted).

For their part, Murphy and Hayden argue that any failure to disclose the Turn-Over Order, of which Hayden was admittedly aware (Doc. 278 at 3), but Murphy was not, does not amount to a fraud on the court.

I have reviewed these filings, those White-Lynch submitted to support her claimed entitlement to the settlement proceeds or, alternatively, for an evidentiary hearing (Docs. 280, 286), and Little's and Murphy's replies (Docs. 281, 282). I have also considered White-Lynch's pending motion to disclose the settlement and the responses thereto. (Doc. 262).

For the reasons that follow, I grant the motions to withdraw the show cause order.

### Discussion

### A. Disclosure of Settlement Agreement

To the extent White-Lynch's motion seeks a copy of the settlement agreement, I deny the motion as moot. The parties' status reports establish that, as a result of proceedings in Kentucky, movant obtained a copy of the settlement agreement, subject to a protective order, in late January, 2016. (Docs. 268, 269, 270).

### B. Transfer of Settlement Funds

To the extent White-Lynch asks me to direct that she receive the proceeds of the settlement, I deny the motion for lack of jurisdiction.

Mr. Little's motion to withdraw the show cause order makes abundantly clear that I lack jurisdiction to take any action *vis-a-vis* the parties' private, and fully completed, settlement.

After reaching their settlement agreement, and in accordance with Fed. R. Civ. P. 41(a)(1)(ii), the parties filed a stipulated dismissal of all claims with prejudice.

"Because Rule 41(a)(1)(ii) does not by its terms empower a district court to attach conditions to the parties' stipulation of dismissal, the only way the Court retains jurisdiction over a settlement agreement . . . is by agreement of the parties, which is then incorporated into the Court's Order of Dismissal." *Georgandellis v. Holzer Clinic Inc.*, 2015 WL 1245855, *2 (S.D. Ohio) (internal quotation marks omitted).

The settlement agreement here did not grant me continuing jurisdiction to resolve disputes over its implementation. Nor did the dismissal order incorporate the terms of the settlement. Accordingly, the stipulated dismissal with prejudice deprived me of jurisdiction to act *vis-a-vis* the settlement and its *corpus*. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994).[3]

I therefore deny movant's motion for an order directing the parties to transfer the settlement proceeds to her for the benefit of Chesley's victims.

### C. Fraud on the Court

The dismissal of the case with prejudice notwithstanding, I do independently retain jurisdiction to determine whether a fraud on the court has occurred. *Waite, Schneider*, *supra*, --- F. Supp. 3d at ----, 2016 WL 447021, at *4.

The fraud on the court doctrine encompasses conduct: 1) on the part of an officer of the court; 2) directed to the "judicial machinery" itself; 3) involving either willful blindness to, or reckless disregard of, the truth; 4) amounting to a positive averment or a failure to disclose where there was

---

[3] I am likewise persuaded that, even if I had jurisdiction, I lack authority to act as a collection agent *vis-a-vis* the Kentucky judgment, despite my initial impulse and desire, as expressed to the respondent counsel, on first learning about the Wind-Up Agreement, Turn-Over Order, and Sham Order shortly after dismissal, to do so. *See, e.g.*, *Estate of Jackson v. Ventas Realty, Ltd. P'ship*, 812 F. Supp. 2d 1306, 1313 n.2 (M.D. Fla. 2011); *Dearborn St. Bldg. Assocs., LLC v. D&T Land Holdings, LCC*, 2008 WL 2397660 (W.D. Mich.).

a duty to do so; and 5) that deceives the court. *Carter v. Anderson*, 585 F.3d 1007, 1011 (6th Cir. 2009).

"[T]he individual accused of perpetrating the fraud must have directly interacted with the court *to prevent an adversary from presenting his case fully and fairly*." *Demjanjuk v. Petrovsky*, 10 F.3d 338, 354 (6th Cir. 1994) (emphasis supplied).

The concerns that prompted me to issue the show cause order remain valid, notwithstanding my inability to do anything to divest Chesley of the funds Davis paid to settle the case.

As noted, there are serious, and still unanswered, questions about Chesley's authority to appear and act as the firm's representative. By what right did he, rather than Rehme, appear and – even more importantly – negotiate the settlement? I thought he was the firm and acting on its behalf. Instead, he was acting solely on his own behalf and doing so under an arrangement later held to be a sham.

Questions also remain as to why Mr. Little did not inform me of the Wind-Up Agreement and, more importantly, the Turn-Over Order.

These are material matters of which I should have been aware before trial.

Hindsight is not always twenty/twenty: I cannot say beyond all doubt just what I would have done differently if informed as I should have been. At the very least, I should have learned, in light of the Wind-Up Agreement, of Chesley's authority to appear and act as Waite, Schneider's representative. Further explanation might or might not have sufficed. Because secrecy and silence kept me unaware, there is no way of now knowing what impact notice of the Wind-Up Agreement might have had.

I can, though, state unequivocally the steps I would have taken had I known of the Turn-Over Order.

First: I would have inquired further, and learned then what I should have known then. Among other things, I would have known about the court proceedings in Kentucky and the litigation in Ohio and Nevada in which Chesley is seeking to avoid compliance with the Turn-Over Order and otherwise avoid recompensing the victim-clients.

Second: I would have declared a time-out to let, at the very least, those state-court proceedings reach finality.[4]

Keeping me in the dark about those proceedings undoubtedly affected how I operated the "judicial machinery" in this case. Had I known what I should have, I would have worked the levers of that machinery differently: I would have applied the brakes, brought things to a standstill, pulled over, and sat tight until the state-court judges, like traffic cops, had cleared the wreckage. Then – and only then – would I have known where I should head and how to get there.

The record therefore shows the intent to affect how I conducted myself. It also shows, I believe, a failure to disclose material matters of which I should have been made aware, with the result that I was misdirected and proceeded otherwise than I would have.

But more is needed to find an attorney committed a fraud on the court: I must also find that counsel's misconduct kept Davis "from presenting his case fully and fairly." *Demjanjuk*, *supra*, 10 F.3d at 354.

---

[4] Mr. Little's motion to withdraw urges, among other things, that I give due comity to the state courts. (Doc. 279 at 36–40). That is *exactly* what I would have done, had I known about the Turn-Over Order before trial.

10

The record before me is barren of any basis on which to find, much less find by clear and convincing evidence, *see Waite, Schneider, supra*, --- F. Supp. 3d at ----, 2016 WL 447021, at *3, what Davis might have done to ensure his right to present his case more fully and fairly. He might have tried to persuade me to proceed; he might have acquiesced in, or even welcomed, that decision.[5]

Trying now to find out what Davis might have done differently and how the trial might have been, from his standpoint, more full and fair would simply be an exercise in speculation.

I conclude, therefore, that I must grant the motions to withdraw the show cause order for want of proof as to the element of adverse impact on the opponent's right to a full and fair trial.

### Conclusion

I reiterate what I have said before: "had I known but a fraction of what I did not know . . . I would have acted differently." *Waite, Schneider*, *supra*, --- F. Supp. 3d at ----, 2016 WL 447021, at *3.

*Someone* – whether in the case and courtroom, as respondent counsel were, or sitting outside, as Dinsmore & Shohl was – should have told me before trial about the Wind-Up Agreement and Turn-Over Order. Had *someone* told me about those documents, I would not feel that, however unwittingly, I have helped a bandit to escape.

This all could have been avoided had Dinsmore & Shohl let me know about the Kentucky proceedings and the Turn-Over Order. That would have brought things to a standstill. There may possibly have been some reason for the firm's silence, but its pleadings offer no such explanation.

---

[5] There can be no doubt, however, that Davis did not want Chesley to get anything from him. Had I not urged him to settle, I have no doubt he would not have settled the case – even if, as I made clear while encouraging the parties to settle, the jury was about to hang on a predicate question.

11

In the end, I cannot find that either Mr. Little,[6] Ms. Hayden,[7] or Mr. Murphy[8] committed a fraud on the court.

It is, therefore,

ORDERED THAT:

1.       White-Lynch's motion to disclose the settlement (Doc. 262) be, and the same hereby

         is, denied in part as moot and denied in part for lack of jurisdiction;

2.       The motions to withdraw the show cause order (Docs. 275, 279) be, and the same

         hereby are, granted;

3.       The order to show cause (Doc. 271) be, and the same hereby is, withdrawn; and

---

[6] I have inferred that Mr. Little, while representing Waite, Schneider, learned of both the Wind-Up Agreement and the Turn-Over. If so, the better course of action, and one that would have entirely averted my calling his forthrightness into question, was to obtain Chesley's permission to disclose those documents. If Chesley refused, Mr. Little should have withdrawn, and left it to Mr. Chesley to do his own dirty work. Though there may be no cause for disciplinary action under Ohio Rule of Professional Conduct 3.3 or this court's disciplinary procedures, I remain of the view that Mr. Little should and could have exercised better judgment and done more to make sure that this court's standing was not, as I fear it has been, put in jeopardy.

Perhaps, in fact, Mr. Little had neither actual knowledge of the Wind-Up Agreement and Turn-Over Order nor reason to know or inquire. If so, he has only Chesley to blame for misusing him as, in the end, he misused this court.

[7] Dinsmore & Shohl gave Ms. Hayden a copy of the Turn-Over Order. Her failure to inform me about that order was at most, and even if at all, a minor error of judgment and certainly not indicative of an intent to deceive. Her job was to defend her client against Chesley's claims. She had no obligation to be concerned about whatever chicanery Chesley was employing in matters having no direct relationship to her or her client. She should consider herself blameless in these proceedings.

[8] Mr. Murphy can likewise feel himself fully exonerated, and remain proud of his exemplary reputation: as the record makes manifestly clear, he had no knowledge of either the Wind-Up Agreement or the Turn-Over Order. To fault him in any way for my ignorance of those documents is unjustified. I do not do so. Nor should anyone else.

12

4.      The order denying the motion to conduct discovery without prejudice (Doc. 294) be,

and the same hereby is, converted to a denial with prejudice.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge[9]

---

[9] Of the United States District Court for the Northern District of Ohio, sitting by designation.